UNITED STATES of America,

v.

Sean HART,

Neil White,

Joseph Orlando,

Lawrence Weil.

Nos. 00–2242 to 00–2244, 00–2283.

United States Court of Appeals, Third Circuit.

Argued July 19, 2001.

Nov. 29, 2001.

James Patton (Argued), Livingston, NJ, Attorney for Appellant, Sean Hart.

Andrew J. Blair (Argued), Clifton, NJ, Attorney for Appellant, Neil White.

James W. Kraus (Argued), Doepken, Keevican & Weiss, Pittsburgh, PA, Attorney for Appellant, Joseph Orlando.

Marc A. Calello (Argued), Nutley, NJ, Attorney for Appellant, Lawrence Weil.

Norman J. Gross (Argued), Office of United States Attorney, Camden, NJ, George S. Leone, Office of United States Attorney, Newark, NJ, Attorneys for Appellee.

Before: SCIRICA, RENDELL and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This case involves five former stockbrokers of L.C. Wegard and Co., Inc., who sold high risk stocks to investors and were convicted for their roles in an extensive securities fraud conspiracy. The brokers made fraudulent statements, failed to disclose material information, employed high pressure sales techniques grossly exaggerating the merits of the stocks, and concealed these practices from both internal and external regulators.

Appellants Joseph Orlando, Lawrence Weil, Neil White, and Sean Hart were all indicted on multiple counts related to the conspiracy, as were several others not involved in this appeal. Weil, White, Adams and Hart pled guilty to one count of the indictment, violating 15 U.S.C. §§ 78j(b) and 78f(f) for conspiring to commit securities fraud between November 1991 and November 1995. They appeal only from sentencing. Orlando did not plead guilty and was convicted at trial of multiple counts of securities fraud. He appeals alleged trial and sentencing errors. Because the cases involve similar facts and defendants share many of the same arguments on appeal, the cases have been consolidated.

## I. Facts

Between 1991 and 1995, defendants were licensed brokers who worked in managerial positions for L.C. Wegard and Co., Inc., a securities brokerage firm.[1] During this time, the defendants coordinated a massive fraudulent scheme that employed intentionally misleading sales scripts and boiler room pressure tactics to defraud tens of thousands of investors. Customers were lured into investing nearly one hundred million dollars in highly speculative securities on the basis of sales scripts containing gross misrepresentations of material fact and baseless predictions about future growth. Defendants then lied about the use of these scripts to investigators and other Wegard employees.

As part of the scheme, some of the defendants recruited and trained young, inexperienced brokers to carry out the fraud via a "three call system." After the New York office picked a "recommended stock," the brokers initiated a series of calls to potential customers. After a "cold call" to ascertain customer interest, a second "qualifying call" was made, and finally a high pressure "sales call" was made to close the sale. These calls were made with scripts developed by managers (like White) and distributed to the brokers (by Orlando, among others). The sales scripts

---

1. Defendants held the following positions in Wegard: Sean Hart was a co-branch manager of Wegard's Bensalem, Pennsylvania office and a regional vice president; Lawrence Weil was a co-branch manager of the Bensalem office and also a regional vice president; Neil White was the assistant branch manager of the Monroeville, Pennsylvania office and a regional vice president; and Joseph Orlando was a manager in Wegard's Monroeville, Pennsylvania office. In addition to their managerial responsibilities, the defendants sold securities to customers.

used in this three-tier calling system failed to disclose the risks of the speculative Wegard stocks, contained false statements of material fact, and made baseless predictions of future growth. After the sales, scripts were destroyed in order to avoid detection of the scheme.

Most of the "recommended stocks" touted in these phone calls were high risk stocks traded on the NASDAQ "small cap" or OTCBB electronic markets.[2] Wegard customers did not have easy access to outside information on these stocks because many were not publicly quoted. In addition, customers were led to believe that the stocks they were investing in would soon be listed on the NASDAQ or the New York Stock Exchange.

In order to sell as many of these "recommended stocks" as possible, Orlando and others directed the young brokers to employ aggressive boiler room tactics. For example, brokers were trained to fraudulently inform customers that stocks could only be purchased in "blocks" of hundreds or even thousands of shares. Brokers were also instructed to ignore the financial status of the buyer or the suitability of stocks for a particular customer. In addition, defendants discouraged new brokers from doing independent research or from reviewing corporate information on recommended stocks.

Defendants actively concealed the conspiracy from investigators. In anticipation of on-site compliance investigations conducted by the National Association of Securities Dealers, Inc., the SEC, state regulators, and Wegard's own internal compliance department, defendants collected, destroyed, or hid the misleading sales scripts. Furthermore, in various internal questionnaires and interviews, they denied the use of such scripts. Defendants also encouraged employees under their supervision to take similar steps of concealment.

After their indictment, all defendants but Victor Samaha and Joseph Orlando entered plea agreements with the government.[3] Following a jury trial before Judge William G. Bassler, Samaha and Orlando were convicted on all counts but one. As noted, Orlando now appeals his conviction and various aspects of his sentencing. Hart, White, and Weil appeal from the calculation of their sentences.

We will begin with Orlando's appeals, and in so doing, we will also reach the merits of some of the other defendants' appeals.

## II. Severance

 Joseph Orlando contends his trial should have been severed from that of co-defendant Victor Samaha. He maintains the failure to grant his pre-trial motion for severance, or to order severance sua sponte during trial based on the misconduct of Samaha and his attorney, warranted a mistrial. We review the denial of the pre-trial motion for severance for abuse of discretion, *see United States v. Sharma*, 190 F.3d 220, 230 (3d Cir.1999), and the

---

**2.** The OTCBB ("Over The Counter Bulletin Board") and NASDAQ are electronic markets for securities. Many of the Wegard "recommended stocks" were from new companies with limited earnings, revenue, and shareholders. NASDAQ listing has minimum requirements for assets, share price, and number of shareholders. The OTCBB does not have minimum requirements.

**3.** A federal grand jury issued a ninety-six count indictment in a related case involving eight other Wegard employees. All defendants but one entered plea agreements with the government and were sentenced by Judge John W. Bissell. Defendants here were indicted on a sixty-eight count indictment (as were four other defendants not in this appeal).

failure to order severance sua sponte for plain error. *See United States v. Quintero*, 38 F.3d 1317, 1339 (3d Cir.1994).

Whether to sever a trial is left to the sound discretion of the district courts. *See Zafiro v. United States*, 506 U.S. 534, 541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981). But even with an abuse of discretion, reversal is not required absent "clear and substantial prejudice" resulting in a manifestly unfair trial. *United States v. Palma–Ruedas*, 121 F.3d 841, 854 (3d Cir.1997), rev'd on other grounds and judgment of conviction reinstated sub nom., *United States v. Rodriguez–Moreno*, 526 U.S. 275, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). Because we find no abuse of discretion or substantial prejudice, we will affirm.

■ Fed. R. of Crim. P. 14 permits the trial court to sever a defendant from a trial where "it appears that a defendant or the government is prejudiced by a joinder." There is no prejudice merely because defendants are tried together. "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro*, 506 U.S. at 537, 113 S.Ct. 933.

■ Here, Orlando contends the prejudice he suffered was twofold. First, he claims he was prejudiced by "spillover evidence" submitted about co-defendant Samaha's role in the conspiracy. But as the government argues, Orlando's defense was premised on shifting the responsibility for the illegal conduct to his supervisors and other managers. Therefore, any evidence about Samaha's role in the conspiracy served to bolster, not diminish, Orlando's defense. Furthermore, because Samaha and Orlando were charged under the same conspiracy, acts committed by one in furtherance of the conspiracy were admissible against the other. *See United States v. DeLuca*, 137 F.3d 24, 36 (1st Cir.1998) ("[S]ince any evidentiary spillover is vitiated where the evidence in all events would have been admissible against the movant, in the context of conspiracy, severance will rarely, if ever, be required.") (internal quotation marks and alterations omitted). For this reason, much, if not all, of this evidence could have been presented against Orlando had the trials been severed.[4] The District Court judge properly instructed the jury to "give separate individual consideration to each charge against each defendant." We see no abuse of discretion or prejudice.

■ Second, Orlando argues he was prejudiced by the conduct of both Samaha and his defense attorney. During trial, Samaha's attorney came forward to claim he had received a death threat because of his pursuit of a defense which claimed he was only a minor player in the much larger "Brennan conspiracy."[5] These threats were fabricated by Samaha and his attorney. Even though Orlando contends the trial judge should have severed the trial sua sponte upon hearing the alleged threats, Orlando never moved for severance on these grounds.

---

4. The testimony about Samaha and the Providence office made no mention of Orlando. This evidence, therefore, was easily segregated. *See United States v. Garner*, 837 F.2d 1404, 1414 (7th Cir.1987).

5. Samaha attempted to present evidence that the owner of Wegard, Leonard Greer, together

er with New Jersey businessman Robert Brennan conspired to have Brennan sell to Wegard large volumes of stock in companies he controlled at extreme discounts. Then, according to Samaha, Wegard brokers would sell these stocks as "recommended stocks" at inflated prices.

Orlando contends the alleged death threats made him reconsider his own defense. We do not find this credible. At the time of the reported death threats (which were ultimately shown to be manufactured by Samaha and his attorney), the "threats" against the attorney were connected to a line of defense not being pursued by Orlando.[6] Orlando had no reason to fear for his own life. That he did not make a motion for severance at the time he learned of these "threats," is evidence the "threats" had little impact on Orlando.

■ Because Orlando did not raise this issue before the trial court, he must demonstrate plain error under Fed.R.Crim.P. 52(b). *See United States v. Quintero*, 38 F.3d 1317, 1339 & n. 16. Orlando must show that "(1) an error was committed; (2) the error was plain; and (3) the error affected [his] substantial rights." *United States v. Stevens*, 223 F.3d 239, 242 (3d Cir.2000), *cert. denied sub nom., Stevens v. United States*, 531 U.S. 1179, 121 S.Ct. 1157, 148 L.Ed.2d 1018 (2001) (citing *United States v. Olano*, 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Despite this high burden, Orlando presents no evidence (other than mere conjecture) that his defense was affected by these "threats." Nor does he proffer any specific evidence he would have presented had it not been for the threats.[7]

Neither the "threats" nor the fact they were manufactured as part of an attempt to obstruct justice was ever revealed to the jury. Besides having no proven effect on Orlando, we cannot see how these "threats" had any effect on the jury or other aspects of trial. We see no error, let alone plain error.

### III. Sufficiency of the Evidence

■ Orlando contends the evidence submitted at trial was insufficient to support his convictions. Our review of the sufficiency of the evidence after a conviction is "highly deferential." *See United States v. Helbling*, 209 F.3d 226, 238 (3d Cir.2000), *cert. denied*, 531 U.S. 1100, 121 S.Ct. 833, 148 L.Ed.2d 715 (2001). We must determine whether the evidence submitted at trial, "when viewed in the light most favorable to the government, would allow a rational trier of fact to convict." *Id.*; *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987) (holding that the court must determine "whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let the jury find him guilty beyond a reasonable doubt."). Given the overwhelming evidence of Orlando's involvement in the securities conspiracy, we will affirm the denial of the motion for Judgment of Acquittal on the grounds of insufficiency of the evidence.

#### A.

■ Orlando contends he did not knowingly and willfully become a member of the conspiracy because he was inadequately trained and was unaware his conduct violated the securities laws. Although he does not contest he engaged in much of the conduct for which he was indicted, Orlando does contest whether he knowingly engaged in fraudulent activity.

Presumably, under his own logic, Orlando would have had just as much to fear in testifying at his own trial if he pursued defenses which placed him in danger. Thus, the failure to sever would have created no prejudice.

---

**6.** Orlando did not join in the efforts to admit this conspiracy evidence, nor did he object when it was excluded as irrelevant.

**7.** Furthermore, it is unclear how a severed trial would have protected Orlando from these "threats" if any had in fact existed.

Evidence of Orlando's fraudulent activities was overwhelming. Ten former customers testified that Orlando recommended unsuitable investments and made baseless claims about the investment risks of the stocks. Orlando also falsely recorded customers' stock preferences on new account forms and failed to disclose several risk factors. Besides his customers, three co-brokers testified to Orlando's fraudulent practices. Despite his attempts to paint himself as an entry-level employee who simply followed orders, Orlando was a manager and immediate supervisor of as many as a dozen brokers.

There was also strong evidence that Orlando himself recognized the illegality of his conduct. He distributed fraudulent scripts and discarded them to avoid detection by regulators. He represented to his managers that, if asked by regulators, he would falsely respond that he did not use scripts. He also directed a broker under his supervision to falsify a questionnaire in a compliance examination so it would appear that Wegard had reviewed due diligence files prior to recommending particular stocks, when Orlando knew this to be false.

Moreover, the fact that entry-level brokers testified they left the firm soon after realizing they were engaged in improper tactics while Orlando remained for over three years supports a strong inference of his knowing participation. Furthermore, Orlando was a licensed stockbroker. Having passed the requisite examinations, Orlando would have known that he had a duty to act in the best interests of his customers. This duty included an obligation to give fair and balanced presentations of any recommended stock, make reasonable efforts to obtain accurate information about a stock before recommending it, disclose risk factors, and assess the customer's investment objectives. The evidence strongly supports he knowingly violated these duties. For all these reasons, a rational trier of fact could find that Orlando knowingly and willfully engaged in the fraudulent conspiracy.

## B.

■ Orlando also contends there was insufficient evidence of securities fraud for convictions on Counts 61, 62, 63, 64, 66, 67, and 68.[8] Generally, Orlando claims the evidence at most proves negligence, not willful and knowing illegal conduct. The evidence belies this claim and demonstrates his willful and knowing participation in securities fraud.

In Counts 61, 62, and 64 Orlando was convicted for failing to disclose material risk factors to James Farnsworth. For example, in Count 61, Orlando was convicted of omitting material facts in connection with his sale of Great American Recreation, Inc., stock to Farnsworth. The Wegard research reported significant risk factors with this stock, including: a) a history of significant losses; b) high debt levels; and c) real estate development subject to the availability of capital. Despite this knowledge, Orlando failed to disclose any risks to Farnsworth.

For each conviction of his failure to disclose material facts (Counts 61–64, 67), the circumstances were almost identical. Orlando had access to all necessary information about the stocks he recommended and even claimed, in response to an internal Wegard questionnaire, that he "reviewed

8. Counts 61, 62, and 64 were for failure to disclose material risk factors to clients. Count 67 was for the omission of material facts in connection with a sale of securities. Counts 66 and 68 were for committing securities fraud by making unauthorized purchases of stock on behalf of various clients.

the due diligence file before recommending a security." Yet in each instance, Orlando failed to provide these material facts to his customer. There was sufficient evidence for the jury to find that Orlando knowingly defrauded his customers by failing to disclose known risk factors.

In Count 68, Orlando was convicted of the unauthorized purchase of Intile stock for Jeffrey McPadden. The government presented evidence that Orlando canceled an arranged purchase of International Franchise Systems, Inc., and instead used the money to purchase Intile stock, all without authorization. McPadden testified that Orlando made the unauthorized purchase and admitted as much during a telephone call. That McPadden could not remember other specific details does not make his evidence insufficient. *See United States v. Hallmark*, 911 F.2d 399, 402–03 (10th Cir.1990) (holding evidence sufficient even though various witnesses were unable to remember specific details of drug transactions). That McPadden did not request a cancellation of the transaction is immaterial. The trade was unauthorized. Furthermore, McPadden was not advised that he could rescind the trade. The evidence was sufficient to support a conviction for securities fraud.

In Count 66, Orlando was convicted of a similar unauthorized purchase. In this instance, Orlando sent a "confirmation" letter reciting his purchase of 5,000 Primedex bonds for customer James Farnsworth. Farnsworth testified that Orlando "went out to acquire the Primedex without a final discussion or definite agreement." Farnsworth then transferred his holdings to another broker and stopped working with Orlando. There was sufficient evidence that Orlando had made an unauthorized trade constituting securities fraud.

Viewing the evidence in the light most favorable to the government, we hold the evidence, in the face of the jury verdict, was more than sufficient for a rational jury to convict on all counts.

## IV. "Consciousness of Guilt/Concealment" Jury Instruction

■ Orlando contends the District Court abused its discretion in charging the jury on "consciousness of guilt/concealment." Orlando maintains there was no evidence to support the instruction. We disagree.

■ In reviewing a jury instruction, we look to see if "the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.1985). There was substantial evidence presented on Orlando's intent and conduct to conceal his fraudulent behavior.

For example, the government presented evidence that Orlando told supervisors he would lie to auditors about employing misleading scripts for solicitation calls, lied on internal questionnaires from the compliance department, and directed a broker under his supervision to lie on the questionnaires as well. The government also showed that Orlando misrepresented customer preferences on new account forms. Orlando would record that a customer was interested in "speculative investments," even after being told the customer wanted to purchase low-risk blue chip stocks. The evidence also demonstrated that Orlando collected fraudulent sales scripts so they would not be found by auditors. Given this evidence of concealment, the instruction was proper. *See United States v. Pflaumer*, 774 F.2d 1224, 1236 (3d Cir. 1985) (finding that evidence the defendant took efforts to conceal a fraudulent scheme from state auditors raised an inference of

the defendant's consciousness of guilt); *United States v. Clark*, 45 F.3d 1247, 1250–51 (8th Cir.1995) (deciding consciousness of guilt instruction proper when the evidence shows the defendants concealed evidence).

## V. Sentencing: Calculation of Loss—Orlando and Hart

### A.

Orlando challenges several aspects of his sentence. First, he disputes the calculation of loss. The District Court found the loss to be $226,605, while Orlando contends the loss was between $70,000 and $150,000. Orlando maintains the loss should not have been calculated at the date when Wegard ceased operations because some stocks increased in value and certain customers could have mitigated their losses by selling. We review findings of facts under a clearly erroneous standard, and legal conclusions under a plenary standard. *United States v. Hillstrom*, 988 F.2d 448, 450 (3d Cir.1993); *see also United States v. Bush*, 56 F.3d 536, 537–38 (3d Cir.1995).

Specifically, Orlando contends that investor Van Wilburn should have taken steps to mitigate his loss. This contention lacks merit because the evidence demonstrates that Wilburn repeatedly asked Orlando to sell his stocks, but Orlando refused and would not send him the certificates. When Wilburn finally received the certificates, he was under no obligation to immediately sell them. Orlando cites to no authority which suggests that his responsibility should be diminished because the defrauded investor could

have mitigated losses by selling the stocks.

Declining to reduce the amount calculated as the loss was well within the discretion of the sentencing judge. *See United States v. Badaracco*, 954 F.2d 928, 937 n. 9 (3d Cir.1992) ("[T]he guideline loss should not be reduced simply because the victim . . . may have augmented it."). We see no error.

Orlando similarly contends that he should not be held responsible for the loss sustained by investor Andris Enzis because the bonds he had purchased increased in value after Wegard ceased operations. We disagree. We see no error in selecting the end of the conspiracy as an appropriate date from which to calculate loss.[9] Orlando's control over the securities ended with the end of Wegard's operations, which terminated the conspiracy. The District Court did not err in calculating loss as of that date.

Furthermore, the loss calculations at trial represented the losses for only ten customers. Given the evidence, the actual number of customers defrauded by Orlando is much higher. Each broker who testified at trial had worked with more than ten customers, yet each had worked at Wegard less time than Orlando.[10]

### B.

Defendant Hart also challenges his loss calculation, contending the District Court improperly calculated his gain from the fraudulent sale of Wegard recom-

---

**9.** Orlando provides no reason why another date should be chosen, nor does he suggest an alternative date.

**10.** Even if we were to reduce the loss calculation of Enzis, Orlando would still have caused losses totaling more than $219,000, well with-

in the range of $200,000 to $350,000 which set the level of the sentence. Therefore, even if we did find the District Court erred in calculating Enzis' loss attributable to Orlando, no relief would be due.

mended stocks at $1,037,200. We disagree.

The government maintained that "the losses in this matter are difficult, if not virtually impossible to quantify, as each and every investor who lost money has not been identified." Therefore, the government proposed estimating losses based on a calculation of Hart's gain. The government determined Hart's gain by tallying his salary, commissions, and bonuses, and then subsequently reduced this figure by a factor of fifteen percent to reflect that a percentage of Wegard's profits was not attributable to the fraudulent scheme.

Hart agrees that his gain could be used to calculate loss, but now contends that the only proper measure of gain was the total commissions earned from the improper sales of securities. Hart also disputes the government's calculation of loss because he argues that defendants' gain was in fact far less than that of Wegard because the corporation's income was mostly derived from stock price increases, and not from commissions. Because Hart did not raise this argument before the District Court, we review for plain error. *United States v. Stephens*, 198 F.3d 389, 391 (3d Cir. 1999).

Hart fails to offer any evidence for the claim that these calculations improperly included Wegard income from the sale of recommended stocks. The government maintains there is no reason to believe the calculation of gain was not based on the compensation paid to Hart as set forth in the pre-sentence report. Furthermore, the sentence would not change even if the loss calculation were reduced by as much as $237,199. We see no plain error.

## VI. Sentencing: Abuse of Position of Trust—Hart and Orlando

■■■■ Hart and Orlando also challenge the District Court's application of United States Sentencing Guideline § 3B1.3, which authorizes a two-level enhancement "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense" U.S.S.G. § 3B1.3. In applying this sentencing guideline, we have employed a two-step analysis: (1) whether the defendant occupied a position of public or private trust; and (2) whether the defendant abused this position of trust in a way that significantly facilitated the crime. *United States v. Iannone*, 184 F.3d 214, 222 (3d Cir.1999) (citing *United States v. Craddock*, 993 F.2d 338, 340 (3d Cir.1993)).

■■■■ Enhancement for abuse of a "position of trust" is often raised with respect to violators of the securities laws. But not all brokers involved with the fraudulent sale of securities occupy a "position of trust" under the guidelines. Determining whether a defendant occupies a position of trust is a fact intensive inquiry. Both the knowledge and the sophistication of the customer may bear on this determination. In *United States v. Iannone*, 184 F.3d at 222, we stated:

Determining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task. Neither § 3B1.3 nor its applicable Commentary clearly defines what is meant by a "position of trust." *United States v. Smaw*, 993 F.2d 902, 905 (D.C.Cir.1993). "Position of trust" could be defined narrowly to encompass only formal fiduciary or employment relationships. Or, the concept could be defined broadly to include any relationship in which a victim places his trust in the defendant. The Commentary to § 3B1.3 indicates that the Sentencing Commission ("Commission") did not intend for the term "position of trust" to be interpreted too narrowly, as the Commentary does not limit the

phrase's application only to formal fiduciary or employment relationships. *See* U.S.S.G. § 3B1.3, comment (n.1) (Nov. 1997). However, a court should hesitate before defining the concept too broadly, as "there is a component of misplaced trust inherent in the concept of fraud." *United States v. Garrison*, 133 F.3d 831, 838 (11th Cir.1998) (quoting *United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir.1995) (internal quotation marks omitted)); *see also United States v. Trammell*, 133 F.3d 1343, 1355 (10th Cir.1998) ("The [§ 3B1.3] guideline enhancement requires more than a mere showing that the victim had confidence in defendant.") (citing *United States v. Brunson*, 54 F.3d 673, 678 (10th Cir. 1995)); *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir.1996) ("In every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud.").

Here, the District Court found that Hart and Orlando occupied and abused positions of trust.[11] Because the determination whether the defendant occupied a position of trust is a legal question, we review this de novo. *Id.* But we review the District Court's finding that defendant abused a position of trust for clear error, as this is a factual question. *Id.*

■■■ We determine whether a defendant occupied a "position of trust" under a three-part test: "(1) whether the position allows the defendant to commit a difficult to detect wrong; (2) the degree of authority which the position vests in defendant

vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." *U.S. v. Pardo*, 25 F.3d 1187, 1192 (3d Cir.1994); *see also Iannone*, .184 F.3d at 223. We consider these factors in light of the guiding rationale of U.S.S.G. § 3B1.3—punishing insiders "who take advantage of a position of trust." *Pardo*, 25 F.3d at 1191. Defendants focus their arguments on the second *Pardo* factor, claiming they lacked the requisite authority because they were merely executing customers' orders in arm's-length transactions. Only stockbrokers who control discretionary accounts, they claim, hold "positions of trust." But their argument addresses only one part of the three-part test. We will address all three *Pardo* factors.

With regard to the first factor, we find the reasoning of the Court of Appeals for the Second Circuit persuasive. *See United States v. Hussey*, 254 F.3d 428 (2d Cir. 2001) (finding that a group of un-licensed security brokers who received undisclosed commissions occupied positions of trust). In *Hussey*, the Court of Appeals for the Second Circuit found sentence enhancement proper under U.S.S.G. § 3B1.3 because the defrauded investors

> were under the impression that [the defendants] were acting as their fiduciaries in suggesting and trading stocks; therefore, [the investors] entrusted[the defendants] with the kind of discretionary authority that is characteristic of a position of trust. This distinction is crucial, because "the primary trait that distinguishes a position of trust from other positions is the extent to which the posi-

---

11. The District Court also found sentence enhancement for Orlando appropriate because he had abused a "special skill." On appeal, Orlando does not contend the District Court erred in finding he had abused a "special skill" developed while training to be a li-

censed stockbroker. Because we find the enhancement was proper because Orlando occupied a "position of trust," we need not review the finding of abuse of a "special skill."

tion provides the freedom to commit a difficult-to-detect wrong."

*Id.* at 432 (quoting *United States v. Laljie*, 184 F.3d 180, 194 (2d Cir.1999)); *see also Iannone*, 184 F.3d at 225 (defendant's managerial position considered a "position of trust" because it allowed him to prevent detection of his fraud via publication of false progress reports). Likewise, the District Court found Orlando's position enabled him to commit a "difficult-to-detect wrong." We conclude the defendants' activities satisfy the first *Pardo* prong because they: (1) recommended stocks that were traded on the NASDAQ "small cap" or OTCBB electronic markets, making it difficult for the inexperienced investor to acquire independent information; (2) refused to take telephone calls from customers requesting to sell stocks; (3) falsely recorded customer preferences on new account forms; and (4) destroyed evidence of fraudulent sales scripts.

The second *Pardo* prong is satisfied because Hart and Orlando were vested with the requisite degree of authority vis-a-vis the object of their wrongful act. As already observed, not all stockbrokers may be vested with enough authority to meet the second *Pardo* prong. *Stewart*, 33 F.3d at 768 (stating that application of the enhancement provision does not turn on simple categories); *United States v. Boyle*, 10 F.3d 485, 489 (7th Cir.1993) ("[T]he sentencing court must look beyond descriptive labels to the actual *nature* of the relationship and the responsibility the defendant is given."). Although we resist categorization, it seems apparent that the responsibilities and discretion exercised by stockbrokers spans the spectrum. At the one end are brokers who exercise authority and discretion over an account and have the power to make sales or take actions on behalf of a customer without specific direction. *See United States v. Davuluri*, 239 F.3d 902, 909 (7th Cir.2001) (holding

that when a broker had complete discretion in using money given to him in order to trade securities to make a profit for his customer, he occupied a "position of trust"); *but see United States v. Mullens*, 65 F.3d 1560, 1566–67 (11th Cir.1995) (control over accounts is not sufficient to satisfy the abuse-of-trust standard). At the other end are brokers who mechanically execute trades requested by customers. *See United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir.2001) (when defendants are involved with investors in arm's-length transactions, they are not in "positions of trust"); *see also Mullens*, 65 F.3d at 1566–67. Many brokers, however, who advise and recommend trades or other actions fall somewhere in the middle of the spectrum. These brokers may have little or no discretion to act without express consent from the customer, yet many of these brokers offer advice and recommendations on trades.

Defendants argue they did not have sufficient discretion to qualify for the U.S.S.G. § 3B1.3 sentence enhancement because they participated in simple stockbroker-customer relationships. The District Court rejected this argument because Orlando treated customers' accounts as de facto discretionary accounts (e.g., cancelling stock purchases without authorization) and because the Wegard boiler-room techniques created atypical stockbroker-customer relationships (e.g., ignoring the suitability of "recommended stocks" for individual customer needs). The District Court also found the brokers' activities satisfied the second *Pardo* factor because their positions provided them with the "wherewithal to commit the wrongful act." *Id.* (quoting *Pardo*, 25 F.3d at 1192). Because managers like Hart and Orlando "certainly had control and authority over the brokers who were essential to effectuating the crime," and because defendants

contacted customers directly, the District Court found they were vested with the requisite "wherewithal." We agree with this analysis. The second *Pardo* factor is satisfied here because defendants did considerably more than just execute orders requested by customers.

Finally, the third *Pardo* factor is satisfied because the customers relied on the defendants' perceived integrity as Wegard stockbrokers. Customers testified Orlando represented himself as a knowledgeable broker who advised customers in buying and selling stocks. Defendants also falsely informed customers that Wegard stocks had to be purchased immediately, without waiting to read risk disclosure documents, because a price increase was imminent, or because the supply of stocks was limited. The brokers committed the fraud by exploiting an advantage stemming from unequal access to information and use of high-pressure tactics; in part, this advantage enabled them to convince their customers to rely on their advice and invest in worthless stocks. Thus, we believe the third *Pardo* factor has also been met. *See Iannone*, 184 F.3d at 225 (finding reliance on perceived integrity when an apparently experienced businessperson offered what seemed to be a great investment opportunity and, based on his representations, victims believed they were investing in a genuine drilling project).

Based on these facts, we conclude that Orlando and Hart each occupied a "position of trust." We also believe that the District Court did not clearly err in determining that Orlando and Hart "abused this position of trust in such a way that significantly facilitated the crime." U.S.S.G. § 3B1.3. We see no error in the District Court's application of the sentencing enhancement.

## VII. Sentencing: Minor Role—Orlando

Orlando also contends he was a "minor participant" entitled to a reduction under § 3B1.2. Because a defendant's role "is a question of fact," we review only for clear error. *United States v. Haut*, 107 F.3d 213, 218 (3d Cir.1997).

Orlando claims he was not involved in the activities of co-defendants Lawrence Weil, Sean Hart, Daniel Petronelli, Victor Samaha, or Malik Tawil and had no contact with other branch offices. He also contends he was supervised by John V. Adams, Jr., Neil White and Ronald Bongo. He claims he did nothing on his own and had no significant authority or discretion. But even if Orlando was less culpable than several other co-defendants, this does not demonstrate that he was entitled to a minor role reduction. All other members of the conspiracy who were more culpable received *enhancements* because of their roles. The District Court's decision to refuse an enhancement or reduction to Orlando adequately reflected his level of culpability. Furthermore, we are convinced that Orlando's role was not one in which "[h]e did nothing on his own," as he claims. Orlando both trained and supervised younger brokers to undertake the fraudulent conduct and to conceal it. There was no clear error here.

## VIII. Refusal to Grant a Downward Departure—Disparate Sentences— Weil, White, Hart

Defendants Weil, White, and Hart all argue they were entitled to a downward departure on the grounds that they received higher sentences than those imposed on co-conspirators sentenced by a different judge. They claim the failure to do so was an abuse of discretion. Defendants contend that a disparity in sentences contradicts the underlying principles of the

sentencing guidelines. *See* United States Sentencing Commission, Guidelines Manual, Ch. 1, Pt. A, intro. (2000) (stating that one of the basic principles of the guidelines is to seek "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders").

■ As an initial matter, we note that the imposition of different sentences for co-conspirators is not error. We have asserted, "[A] criminal defendant has no constitutional right to be given a sentence equal in duration to that of his or her co-defendants," *United States v. Smith*, 839 F.2d 175, 179 (3d Cir.1988), and a "[d]isparity of sentence between co-defendants does not of itself show an abuse of discretion." *United States v. Cifuentes*, 863 F.2d 1149, 1156 n. 5 (3d Cir.1988).

Although this issue was not raised by each defendant, the District Court was made fully aware of the disparity between its sentences and those of Judge Bissell on co-conspirators. The District Court exercised its discretion in refusing to grant an additional downward departure.

■ Responding to Hart's Rule 35(c) motion, the District Court explained that "[t]hough it had the discretion to do so, the Court declined to depart downward to mirror the sentences imposed by Judge Bissell." We have no jurisdiction to review its exercise of discretion. *See United States v. Vitale*, 159 F.3d 810, 816 (3d Cir.1998); *United States v. Richardson*, 901 F.2d 867, 869–70 (10th Cir.1990) (denying jurisdiction in a case involving a denied request for a downward departure due to disparities in sentences of co-conspirators).

### IX. Use of Evidence From Other Trial—Weil and White

■ Weil and White claim that the District Court erroneously considered evidence from Orlando and Samaha's trial in determining their sentences without providing notice this evidence would be used against them. Both defendants concede the sentencing judge may rely on extrinsic evidence in sentencing, even that from another trial. *See, e.g., United States v. Knobloch*, 131 F.3d 366, 370 (3d Cir.1997)(finding no plain error where the district court imposed an enhancement based on evidence from a co-defendant's trial, explaining that "[n]o rule of law prohibits the [sentencing] court from making its factual conclusions at sentencing based on testimony from a separate proceeding. . . ."). They also concede there is no limitation to using evidence only contained in the Pre-sentence Investigation Report. But they contend the use of this evidence, without notice, was inappropriate.

■ Because neither Weil or White raised these arguments before the District Court, we review for plain error. See *United States v. Nappi*, 243 F.3d 758 (3d Cir.2001). The sentence will only be set aside if: "1) the District Court erred; 2) the court's error was clear or obvious; 3) [defendant] can show that the error affected his substantial rights, i.e., that it prejudiced him; and 4) not correcting the error would seriously impair the fairness, integrity, or reputation of a judicial proceeding." *United States v. Reynoso*, 254 F.3d 467, 470 (3d Cir.2001).

We recently held that notice should be given defendants when extrinsic evidence is used at sentencing. In *Reynoso*, we stressed the importance of the notice requirement, stating, "Following both Supreme Court jurisprudence and our own, we hold that before a sentencing court may rely on testimonial or other evidence from an earlier proceeding, it must afford fair notice to both defense counsel and the Government that it plans to do so." *Id.* Failure to provide notice met the first

prong of the plain error standard; i.e., that the District Court erred. As in *Reynoso*, however, the defendants have "not met [their] burden of showing that the error affected [their] substantial rights." *Id.* Weil and White argue in the abstract that they may have been able to challenge the admissibility of some of the evidence, or would have had a chance to rebut the evidence, but have offered no concrete examples. When questioned at oral argument, defendants were unable to point to any specific objectionable evidence that was not already part of the Pre-sentence Investigation Report. Furthermore, defendants have the burden of not only showing that they *may* have been able to *rebut* evidence, but they "must show that the District Court would have imposed a lesser sentence had defense counsel been given the required notice." *Id.* Weil and White have made no showing that even if they had been able to rebut certain evidence, it would have resulted in a lower sentence. They have demonstrated no prejudice.

Most, if not all, of the evidence was contained in the Pre-sentence Investigation report. We see no plain error.

### X.

We will affirm the judgment of conviction and sentence on Joseph Orlando and the sentences on Lawrence Weil, Neil White, and Sean Hart.