NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-4797
_____

UNITED STATES OF AMERICA

v.

ALVIN JEROME WALTON,
                              Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. Action No. 04-508-003)
District Judge:  Honorable Jan E. Dubois
_____

Submitted Under Third Circuit LAR 34.1(a)
April 28, 2011
_____

Before:  SLOVITER, GREENAWAY, JR., and ROTH, Circuit Judges

(Opinion Filed:  June 7, 2011)
_____

OPINION
_____

GREENAWAY, JR., Circuit Judge

     Appellant Alvin Jerome Walton ("Walton") appeals the District Court's Order

denying his Batson challenges, his Brady challenges, and his motion for a new trial.

Walton also contends that the District Court's jury instructions on aiding and abetting the

distribution of cocaine were not appropriate.[1]  On December 5, 2008, Walton was sentenced to 180 months of imprisonment, eight years of supervised release, a $1,000 fine, and a special assessment of $300.  Walton now files this timely appeal.

For the following reasons, we will affirm the District Court's Order.

## I.  BACKGROUND

We write primarily for the benefit of the parties and shall recount only the essential facts.  On February 24, 2005, a superceding indictment charging Walton with one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846, and two counts of distribution of cocaine and aiding and abetting in the distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2, was unsealed.[2]  In April 2005, the District Court appointed counsel to represent Walton.  A second superceding indictment was filed on November 17, 2005, which did not materially alter the charges against Walton.[3]

According to the second superceding indictment, on July 26, 2004, Walton mailed two express mail packages (allegedly containing narcotics) to 1810 South Broad Street in Philadelphia, PA, from the Timmons Lane Post Office in Houston, Texas.  On July 27,

---

[1] Walton states eight separate claims in his pro se petition.  The first two claims relate to Walton's Batson challenge, the next five claims relate to his Brady issues, and the final claim relates to the District Court's jury instructions.

[2] Two other co-defendants, Anthony Angelo Winfrey and James Bostic, Jr. were charged in the superceding indictment.

[3] Co-defendants Winfrey and Bostic were also charged in the second superceding indictment.

2004, a postal inspector, Yvette Thomas ("Inspector Thomas") intercepted the express mail packages in Philadelphia. A narcotics detection dog reacted positively to the packages. After securing a search warrant, Inspector Thomas opened and photographed the contents of the packages, which also tested positively for cocaine. Inspector Thomas repackaged the packages and arranged a controlled delivery. As a result of the controlled delivery of the packages, Walton was arrested and later indicted.

During the jury selection process, the government exercised a number of peremptory challenges. Three of the individuals the government struck from the venire were minorities, resulting in a venire with no minority jurors. Walton's counsel sought to challenge the government's exclusion of these three specific jurors, pursuant to Batson. During the hearing regarding the Batson challenges, the government provided its reasons for exercising a peremptory challenge as to each of the minority jurors it struck. Walton's counsel argued that in each instance, the stated basis was pretextual. The District Court concluded that the government produced, as is required, "a non-race-based explanation" for striking each of the three jurors, and denied Walton's Batson challenges. (App. Vol. II, Part I, 135).

On April 11, 2006, Walton proceeded to trial on all counts of the second superceding indictment. After the government presented its case-in-chief, Walton's counsel moved for a judgment of acquittal, pursuant to Rule 29. The District Court denied the motion. The jury found Walton guilty of all charges. After trial, Walton filed a motion to dismiss the indictment, asserting prosecutorial misconduct. The District

3

Court also denied that motion. On June 12, Walton's counsel filed a motion to withdraw as counsel, based on irreconcilable differences with his client. On June 20, 2006, the District Court held a hearing with Walton and all counsel present. The District Court granted Walton's counsel's motion to withdraw, and appointed new counsel to represent Walton.

On November 2, 2006, Walton's new counsel filed a motion for a new trial, pursuant to Fed. R. Crim. P. 33(a), alleging that the government failed to disclose impeachment evidence and failed to preserve exculpatory evidence. On February 1, 2007 and June 13, 2007, the District Court conducted a Brady hearing on Walton's evidentiary issues.

On July 20, 2007, the District Court issued a Memorandum and Order denying Walton's motion for a new trial and rejecting Walton's Brady challenges.[4]

Walton was sentenced on December 5, 2008, and filed this timely appeal. On April 23, 2010, Walton's counsel filed a brief on appeal. However, Walton later filed a motion to proceed pro se and to withdraw the brief his counsel had filed. This Court granted Walton's request and his pro se brief was filed on September 20, 2010.[5]

---

[4] The District Court denied Walton's Brady claim based on the surveillance videotape received by Postal Inspector Thomas, and also rejected Walton's claim that the government unlawfully failed to preserve the surveillance videotape. Finally, the District Court rejected Walton's claim that the government illegally failed to correct Postal Inspector Thomas's false testimony at trial.

[5] Although this Court received both the pro se brief and the brief from Walton's former counsel, we utilize the pro se brief in our review, as do the Appellees.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction, pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over questions of law. Riley v. Taylor, 277 F.3d 261, 277 (2001). "An appellate court ordinarily reviews a district court's ruling on a motion for a new trial on the basis of newly discovered evidence for abuse of discretion. However, where the motion for a new trial is based on a Brady claim, which presents questions of law as well as questions of fact, the appellate court will conduct a de novo review of the district court's conclusions of law as well as a clearly erroneous review of any findings of fact. United States v. Pelullo, 399 F.3d 197, 202 (3d Cir. 2005). Batson claims are reviewed for clear error. Hernandez v. New York, 500 U.S. 352, 364-66 (1991). Because Walton did not object to the jury instructions at trial, we review the District Court's instructions to the jury for plain error. United States v. Antico, 275 F.3d 245, 265 (3d Cir. 2001).

## III. LEGAL STANDARD

*Batson Challenges*

The Equal Protection Clause "prohibits a prosecutor from using a peremptory challenge to strike a prospective juror solely on account of race." Coombs v. Diuglielmo, 616 F.3d 255, 261 (3d Cir. 2010). "The same equal protection principles

5

that are applied to determine whether there is discrimination in selecting the venire also govern the State's use of peremptory challenges to strike individual jurors from the petit jury." Batson v. Kentucky, 476 U.S. 79, 79 (1986).

In Batson, the Supreme Court held that "the state denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." 476 U.S. at 85. "A criminal defendant may object to the race-based exclusion of jurors affected through peremptory challenges regardless of whether the defendant and the excluded juror share the same race." See Powers v. Ohio, 499 U.S. 400, 404-16 (1991).[6]

A trial court conducts a three part analysis to assess a Batson challenge. First, the defendant has to "establish a prima facie case [of racial discrimination] by demonstrating a pattern of peremptory challenges of jurors of a particular race." United States v. Milan, 304 F.3d 273, 281 (3d Cir. 2002); See also, Rice v. Collins, 546 U.S. 333, 338 (2006). Second, if discrimination is shown, the government has the burden to "rebut the prima facie case by tendering a race-neutral explanation for the strikes." Milan, 304 F.3d at 281. Third, if the government does present a race-neutral explanation, the defendant must then prove purposeful discrimination by showing that the proffered explanation is pretextual. Id.

---

[6] See also Trevino v. Texas, 503 U.S. 562 (1992)(where the court recognized the claim of an Hispanic who asserted that the state violated the equal protection clause of the Constitution's Fourteenth Amendment by using peremptory challenges to exclude the only three black members of the venire).

*Brady Claims*

In Brady v. State of Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).

For a Brady claim to succeed, the petitioner must make three showings: (1) the evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment. See Pelullo, 399 F.3d at 209.

## IV.    ANALYSIS

*Walton's Batson Challenges*

Walton contends that three peremptory challenges of the government were improper, arguing that the government exercised racially motivated peremptory challenges during jury selection and that the trial court misapplied the governing standard announced by the Supreme Court in Batson, by failing to make required credibility findings regarding the government's proffered justifications for his peremptory strikes during voir dire. We disagree.

Walton's counsel informed the District Court that there was a Batson challenge, based on three of the government's peremptory strikes. After Walton's counsel identified the three potential jurors who were stricken by the government, the District Court reviewed the burden of proof requirements for a prima facie case of discrimination under

7

Batson. The government then denied that the challenges were based on race and proffered race-neutral bases for its challenges.

The first challenge by Walton's counsel was related to Juror 12. During voir dire, the government informed the District Court that it would like to strike Juror 12 for cause, after noticing that Juror 12 kept her eyes closed during the proceeding. The government suggested that the District Court ask Juror 12 whether or not she had a problem with staying awake. The District Court agreed, and proceeded to ask Juror 12 a number of questions, including whether she was on medication and if so, whether the medication induced drowsiness. Juror 12 responded that she was on allergy medication and medication for hypertension. Juror 12 also stated that she was not dozing, but that her eyes were bothering her because of her allergies. When the District Court inquired as to whether Juror 12 would be able to pay attention to the evidence, she answered in the affirmative. The District Court then invited counsel from both sides to ask questions of Juror 12. After they declined to do so, the District Court stated that "She said her eyes were bothering her and we are not striking her for cause." (App. Vol. II, Part I, 89). Later, the government struck Juror 12 by using one of its peremptory challenges. The government stated that Juror 12 was stricken because she had her eyes closed during voir dire, and the government thought that she was asleep during the questioning, and that she would not pay attention during the trial.

The second African-American struck by the government was Juror 13, a postal service worker. The government explained that it had stricken Juror 13 because "Yvette

8

Thomas [Inspector Thomas] explained . . . that U.S. Postal Inspectors investigate postal employees and we felt like the employees would not necessarily be favorable, but would be biased against the Government because they get actually investigated by postal inspectors." (App. Vol. II, Part I, 133). The government then pointed out that another postal employee, a white male, had also been stricken.

The next minority juror struck, Juror 21, was not African American. Indeed, the government expressed some surprise when she was described as a Latina by Walton's counsel.[7] According to the government, Juror 21 was struck because she did not answer any questions. The government stated "[f]rom our observations and from Yvette Thomas' observations, we did not think she was paying attention to the questions and that is why we struck her. That is the reason why our observations were made and the defense struck a lot of people that didn't answer any questions." Id.

Walton's counsel pointed out that the fact remained that the jury did not have any African-Americans on it. However, the District Court pointed out that "the test is not how the jury appears at final selection. The test is whether the jury panel is drawn in a way that assures representation of minorities and there has been no suggestion . . . that there is anything improper about the way in which our juries are selected, our jurors are selected." (App. Vol. II, Part I, 134). We agree.

---

[7] Although Juror 21 is not of the same race as Walton, she is a minority, and is therefore included in a Batson analysis. See Powers, where the Supreme Court held that a white criminal defendant had standing to object to, and appeal the exclusion of, black jurors through peremptory challenges, even though the defendant and the potential jurors were of different races. 499 U.S. at 401.

9

The District Court concluded that the government had come up with a non-race-based explanation for striking the three minority jurors. Hence, there was no basis for determining that a <u>Batson</u> argument posited by the defense should be sustained. Although the District Court did express some disappointment that there was no minority representation in the venire, that concern did not sufficiently redound to the detriment of Walton to sustain the <u>Batson</u> challenge.

Next, Walton claims that the District Court omitted <u>Batson</u>'s third step, i.e., the trial court must make a credibility determination regarding whether the explanations advanced by the government were pretextual.[8] We disagree. The District Court made a specific finding, stating that "the Government has come up with a non-race-based explanation for the striking of those three jurors." (<u>Id.</u> at 135). This statement indicates that the District Court did indeed conduct the third step of the analysis.

Walton also contends that the District Court erred by misstating that <u>Batson</u> applies only to members of Walton's race. We disagree. Even though the District Court stated that the government exercised peremptory challenges to remove members of defendant's race, the District Court made several other statements that indicate that all minorities are included in the <u>Batson</u> analysis, such as: "there are no African-Americans or other minorities on the jury panel that remains." (<u>Id.</u> at 132). During the discussion

---

[8] In his brief, Walton also stated that the government failed to offer a race-neutral justification for the challenged strikes. However, we find that the District Court did make a specific finding that the Government had a non-raced-based explanation for the challenged strikes.

10

regarding the <u>Batson</u> challenges, the District Court also referred to the three jurors, indicating that he was obviously aware that all minorities were included in the <u>Batson</u> analysis.

We find that the District Court's misstatement was harmless beyond a reasonable doubt. <u>Marshall v. Hendricks</u>, 307 F.3d 36, 73 (3d Cir. 2002). An error is harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Bond v. Beard</u>, 539 F.3d 256, 276 (3d Cir. 2008) (where this Court found that the government presented such extensive evidence of the defendant's guilt that the error could not have had a substantial and injurious effect or influence in determining the jury's verdict). (Internal citations omitted).

Finally, Walton claims that the District Court erred by ruling that Walton had not proven purposeful discrimination by the government and that the District Court "expressly ruled that Appellant had made a prima facie showing of intentional discrimination." (Appellant's Br. at 20). We disagree. Walton misquotes the District Court's statement. The District Court stated "I think the defendant has made a prima facie case accepting the statement that there are no African-Americans or other minorities on the jury panel that remains." (App. Vol. II, Part I, 135). That is quite different than concluding that there is a finding of discrimination by the Court. The District Court never stated or intimated that intentional discrimination was shown. We find that the District Court did not err.

11

*Walton's Brady Claims*

Walton's next group of claims involves the government's failure to produce a surveillance videotape from the Timmons Lane Post Office where Walton allegedly mailed the packages of cocaine. Walton contends that the District Court erred by:

(1) misapplying the controlling legal standard by ruling that the government was not obligated to obtain evidence favorable to the defense;
(2) ruling that the government's failure to disclose impeachment evidence favorable to appellant was harmless;
(3) ruling that the government's destruction of evidence did not undermine confidence in the jury's verdict;
(4) ruling that the government had not acted in bad faith when it destroyed potentially exculpatory evidence; and
(5) ruling that the government's failure to correct knowingly false trial testimony was harmless beyond a reasonable doubt.

(1)  *The District Court erred by misapplying the controlling legal standard and ruling that the government was not obligated to obtain evidence favorable to the defense.*

The Supreme Court has held that the government is required to disclose evidence favorable to the accused and material to either guilt or to punishment. Brady, 73 U.S. at 87. The 'Brady rule' extends to evidence regarding impeachment of witnesses and the government's obligation to produce to the defense impeachment material. Giglio v. United States, 405 U.S. 150, 154 (1972). In his claim that the District Court misstated the Brady rule, Walton misstates the expectation. "Brady provides that the suppression by the prosecution of evidence favorable to an accused, upon request by the defense, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. This rule has been modified

12

to require a prosecutor to disclose exculpatory evidence even when there has not been a request for the information by the defense." United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991). Walton believes that the government was required to obtain any evidence favorable to the defense. He is mistaken. The government is required to disclose evidence in its possession, favorable to the defense. Brady does not create an affirmative obligation on the government to find evidence that may be exculpatory for defendant's use.

(2) *The District Court erred by ruling that the government's failure to disclose impeachment evidence favorable to appellant was harmless beyond a reasonable doubt.*[9]

Walton argues that the District Court's ruling under Giglio that the government's "failure to disclose" the surveillance tape was harmless beyond a reasonable doubt was in error. In Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991), the Supreme Court recognized a distinction between structural defects, which require reversal, and trial errors, which require a reviewing court to engage in harmless error analysis (particularly, when Constitutional error exists). "A trial error is an error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Id. at 307-08.

---

[9] See Marshall, 307 F.3d at 74, where an error is harmless if there is no reasonable possibility that the evidence complained of might have contributed to the conviction. The court must be able to declare a belief that it was harmless beyond a reasonable doubt.

13

"Whether . . . an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts." Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). In Walton's case, these factors include: (1) the importance of the videotape to the prosecution's case; (2) whether the videotape was cumulative; (3) the presence or absence of evidence corroborating or contradicting the videotape on material points; (4) the extent of cross-examination otherwise permitted; (5) and the overall strength of the prosecution's case. Id.

There is no way to determine what would have been on the July 26, 2004 videotape, despite Walton's contention that it was impeachment evidence. Inspector Thomas was cross-examined at length by Walton's counsel. The videotape was not important to the government's case. The government presented a strong case, with overwhelming evidence of Walton's guilt, in the absence of the videotape. That evidence included Walton's fingerprints on the express mail packaging materials and the cellophane-wrapped cocaine, co-defendant Winfrey's testimony, and evidence of shipping material found in Walton's home.

Inspector Thomas testified that there was no videotape depicting July 26, 2004, the date the two packages were mailed to 1819 South Broad Street in Philadelphia, PA. She further testified that the surveillance tape she did have was for June 26, 2004, and that she did not notice the erroneous date until much later.

In its July 20, 2007 Memorandum and Order denying Walton's motion for a new trial, the District Court found no Brady violation. The District Court found that the

14

government did not have the videotape that Walton considers to be impeachment evidence. We conclude that the error committed by Inspector Thomas in obtaining the wrong videotape was harmless beyond a reasonable doubt, and did not affect the outcome of the trial.

(3)     *The District Court erred by ruling that the government's destruction of evidence did not undermine confidence in the jury's verdict.*

Next, Walton contends that the government destroyed evidence, i.e., the surveillance tape from the Timmons Lane Post Office, which may have affected the jury's verdict. There is no evidence that the government either withheld or destroyed potentially exculpatory evidence. Further, there is no reasonable probability that the results of the proceeding would have been different had the surveillance videotape been preserved by the Timmons Lane Post Office. See Kyles v. Whitley, 514 U.S. 419, 434 (1995) (evidence is material under Brady where there is a reasonable probability that the result [the verdict] would have been different had the evidence been produced). No such reasonable probability exists here. There is no error.

(4)     *The District Court erred by ruling that the government had not acted in bad faith when it destroyed potentially exculpatory evidence.*

The government's failure to preserve evidence does not amount to a due process violation unless the government acted in bad faith. Arizona v. Youngbood, 488 U.S. 51, 58 (1988). Based on the record before this Court, there is no indication that the

15

government acted in bad faith. At the first <u>Brady</u> hearing,[10] Inspector Thomas admitted that at trial, she had expressly denied reviewing any surveillance videotapes or knowing that surveillance videotapes even existed. Later at the post-trial evidentiary hearing, Inspector Thomas corrected her previous misstatement, stating that the Timmons Lane Post Office did have a video surveillance system and that although she had requested the surveillance videotape of July 26, 2004, she neglected to review it until much later. When she did review the videotape, Inspector Thomas discovered that it was not the correct videotape (it was the June 26, 2004 videotape). The District Court concluded that, at worst, the inspector "was negligent in failing to promptly review the videotape she received and for not requesting that the correct tape be sent. There is no evidence of bad faith." (App. Vol. I, Part I, 25). We agree with the District Court - - there is no error.

(5)     *The District Court erred in ruling that the government's failure to correct knowingly false trial testimony was harmless beyond a reasonable doubt*.

Walton's final <u>Brady</u> claim asserts that the District Court erred in determining that allowing Inspector Thomas's testimony did not amount to error. Using a harmless error analysis, we find that: (1) Inspector Thomas's initial testimony, where she testified that there was no surveillance videotape monitoring system at the Timmons Lane Post Office, was false or mistaken; (2) Inspector Thomas made the statement during direct testimony at trial; (3) Inspector Thomas corrected her testimony during cross-examination at trial,

---

[10]  Two evidentiary hearings were held. The first hearing was held on 2/1/07 and the second hearing was held on 6/13/07. The purpose of the second hearing was so that Walton could present additional evidence regarding the surveillance videotape.

16

acknowledging her mistake, and stating that she had confused this case with another she was working on; (4) Walton's counsel impeached Inspector Thomas during the post-trial Brady hearing, and pointed out the discrepancies in Inspector Thomas's testimony in his closing remarks at trial, for the benefit of the jury; (5) the mistake was not intentional; and (6) the government did not rely on Inspector Thomas's testimony in presenting its case. There was enough evidence presented at trial to convict Walton without Inspector Thomas's testimony. Inspector Thomas's testimony was cumulative and would not have affected the outcome of the trial or caused any substantial injury to Walton. For these reasons, we find that any failure on the part of the government to correct Inspector Thomas's testimony was harmless beyond a reasonable doubt.

*Jury Instructions*

Walton was found guilty of two counts of distribution of cocaine and aiding and abetting the distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2. Walton's final claim was that the District Court erred by instructing the jury that it could convict on the distribution counts under a theory of aiding and abetting. Walton did not object to this instruction at trial, and for that reason, we review the District Court's Order for plain error. United States v. Antico, 275 F.3d 245, 265 (3d Cir. 2001). In order to make a determination of plain error, "the first limitation on appellate authority under Rule 52(b) is that there indeed be an error." United States v. Olano, 507 U.S. 725, 732 (1993). Next, the error must be "plain" and the third is that the error must "affect substantial rights." Id. at 734. "Even if these requirements are met, the court

17

should not exercise its discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 736.

In the indictment, Walton was charged with one count of conspiracy to distribute cocaine, and two counts of distribution of cocaine and aiding and abetting the distribution of cocaine. Because he was so charged, the District Court was correct to instruct the jury on the alternative standard of proof for a conviction on aiding and abetting the distribution of cocaine. United States v. Phillips, 869 F.2d 1361, 1364-66 (10th Cir. 1988) ("upon a fair reading of the indictment as a whole, the contested instruction regarding aiding and abetting did nothing more than reflect the allegations in the indictment. It did not amend the indictment, and there was no variance in the proof.") Therefore, we find no error in the District Court's instruction regarding the alternative theory of aiding and abetting.

Walton also contends that the evidence did not support an aiding and abetting theory, as "the government failed to charge any person other than Appellant of a principal offense in the distribution counts, and under the evidence no person other than Appellant committed a principal offense." (Appellant's Br. at 36). We disagree.

"In order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associate himself in some way with the crime, and that he willfully and knowingly seek by some act to help make the crime succeed." United States v. Gordon, 290 F.3d 539, 543 (3d Cir. 2002). We "must determine whether the evidence submitted at trial, 'when viewed in the light most favorable to the government,

18

would allow a rational trier of fact to convict.'" United States v. Hart, 273 F.3d 363, 371 (3d Cir. 2001) (citations omitted). Review of the sufficiency of the evidence supporting a conviction is "highly deferential." Id.

During trial, the government presented evidence that Walton employed Winfrey and possibly Bostic in the cocaine distribution. In addition, although Walton contends that another person mailed the two packages of drugs from the Timmons Lane Post Office, the fact that Walton's fingerprints were found on the packages could lead a jury to find that Walton aided and abetted that individual. We find that there was more than enough evidence, including evidence linking Walton to Bostic and Winfrey and the fact that Walton's fingerprints were found on the packages, to indicate that at the very least, Walton aided and abetted someone in distributing the cocaine.

## V.    CONCLUSION

The District Court's denial of Walton's Batson challenges was proper. The District Court did not err in its rulings regarding Walton's Brady claims. The jury instructions on aiding and abetting were legally sufficient and appropriate. We will affirm the District Court's Order.