

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-1994

# United States of America v. Pardo

Precedential or Non-Precedential:

Docket 93-5104

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Pardo" (1994). *1994 Decisions*. Paper 25.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/25

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 93-5104


UNITED STATES OF AMERICA

v.

JUAN PARDO,
                    Appellant


Appeal from the United States District Court
      for the District of New Jersey
        (D.C. Crim. No. 92-00235-1)


Argued January 19, 1994

Before:  SLOVITER, Chief Judge, SCIRICA and
         LEWIS, Circuit Judges

(Filed  May 25, 1994)



Barbara M. Donovan (Argued)
  Assistant Federal Public Defender
Office of Federal Public Defender
Newark, NJ  07102

        Counsel for Appellant

Michael Chertoff
  United States Attorney
Edna B. Axelrod
Eric L. Muller (Argued)
  Assistant United States Attorneys
Office of United States Attorney
Newark, NJ  07102

        Counsel for Appellee



1

OPINION OF THE COURT

SLOVITER, Chief Judge.

Appellant Juan Pardo challenges on four grounds his sentence imposed after a guilty plea to single counts of bank and wire fraud and a count of failure to appear. Two grounds are set forth in his counselled brief, and two others appear in a supplemental pro se filing. Although we reject most of Pardo's arguments, we agree that the district court misapplied United States Sentencing Guideline §3B1.3 when it determined that Pardo's friendship with a bank manager constituted a position of trust that facilitated his defrauding the bank. See United States Sentencing Commission, Guidelines Manual, §3B1.3 (1993) [hereinafter USSG]. We will therefore vacate the judgment of sentence and remand for resentencing.

I.

FACTS AND PROCEDURAL HISTORY

There is no dispute about the relevant facts in this case. Juan Pardo engaged in a classic check kiting scheme in which he defrauded First Fidelity Bank out of more than $51,000, in violation of 18 U.S.C. § 1344 (Supp. IV 1992) (bank fraud) and 18 U.S.C. § 2 (1988), and defrauded numerous clients in excess of $204,000 by collecting loan application and processing fees for loans that they never received, in violation of 18 U.S.C. § 1343 (Supp. IV 1992) (wire fraud) and 18 U.S.C. § 2 (1988). Shortly after his initial arraignment, Pardo fled to Canada where he remained for several weeks, and thus failed to appear in violation of 18 U.S.C. §§ 3146(a) and 2 (1988).

2

A.   The Check Kiting Scheme

Shortly before the incident which was the subject of the bank fraud charge in this indictment, Pardo engaged in another check-kiting scheme at the Guttenberg, New Jersey, branch of First Fidelity Bank which caused First Fidelity a loss of $7,324.39.  Although it was never reimbursed for this loss, First Fidelity declined to prosecute Pardo.  The bank, however, did report Pardo's illegal conduct to Chex Systems as a security measure.

On October 1, 1991, notwithstanding his earlier fraud on First Fidelity, Pardo opened an account at the Ridgefield Park branch of First Fidelity under the name of SJF Funding Corporation, the same corporation he used in the earlier fraud. The usual bank practice required a background check, which would have revealed Pardo's prior fraud on First Federal itself, but that routine was not followed by Brigit Schumann, the branch manager, who had been a personal friend of Pardo's wife for ten years and was a bridesmaid at the Pardos' wedding.  The record is silent as to whether Pardo said anything to induce Schumann's failure to take precautions, or whether she was just negligent.

Between October 4 and October 15, 1991, Pardo deposited five checks into the First Fidelity account totalling $232,000 which had been drawn on accounts Pardo had at other banks, and which were uncollectible.  Nonetheless, almost immediately after depositing these checks, Pardo began to write checks against those deposits on his First Fidelity account, and by October 23, 1991, he had withdrawn a total of $76,771.86.  When Schumann

3

became aware of Pardo's conduct and confronted his wife, she received assurances that Pardo would reimburse the bank for the fraudulently obtained funds. Later, Frank Amato, an associate of Pardo, wired $25,000 back to the bank. First Fidelity received no additional reimbursement and its total loss due to this second check kiting scheme is $51,771.86.

B. The Loan Fraud Scheme

In the Spring of 1991, Pardo became the North American representative of Siam Commercial Finance S.A., a company based in Bangkok, Thailand. His function was to locate customers seeking loans from several hundred thousand to several million dollars, and he received in excess of $204,000 as loan application fees, servicing fees and pre-commitment fees from at least fourteen individual and corporate clients. Neither he nor SJF Funding successfully placed a single loan with Siam through at least March 1992, the month before he was indicted. Although Pardo later claimed he was unaware of Siam's fraudulent activities, he did not deny that he altered checks that he received in these transactions nor that he deposited them in his personal account.

C. Failure to Appear

Following his arrest, Pardo was released on bail. Thereafter, the government sought his detention because it had learned of other activities by Pardo and was seeking a superseding indictment concerning additional charges of bank and wire fraud. On Friday, May 8, 1992, the district court ordered a second hearing to be held on the following Monday, May 11, 1992.

4

Pardo fled to Canada over that intervening weekend. He was arrested on June 22, 1992, the date that the trial on the original charges was to begin, when he tried to reenter the United States near Richford, Vermont.

On September 30, 1992, Pardo pled guilty to Counts 2 (bank fraud), 16 (wire fraud) and 47 (failure to appear) of the indictment pursuant to a plea agreement reached with the government. On February 8, 1993, the district court sentenced Pardo. The court determined that Pardo's total offense level was 18, based in part on its application of a two-level decrease for acceptance of responsibility (USSG §3E1.1) and a two-level increase for abuse of a position of trust (USSG §3B1.3). The court calculated Pardo's criminal history level as II, based in part on his conviction on a disorderly persons charge in state court for which he had not yet been sentenced. The court then sentenced Pardo to 37 months imprisonment (31 months on Counts 2 and 16, followed by a consecutive six-month term on Count 47) and to four years of supervised release, and ordered him to pay $39,135.93 in restitution and $150 in special assessments. Pardo filed a timely appeal on February 16, 1993. Pardo moved and was given permission to file a pro se supplemental brief. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) (1988) and 28 U.S.C. § 1291 (1988).

## II.

## DISCUSSION

We first consider Pardo's claim that the district court misapplied Sentencing Guideline §3B1.3. That section, which

5

authorizes a two-level enhancement for abuse of a position of

trust, provides:

> If the defendant abused a position of public
> or private trust . . . in a manner that
> significantly facilitated the commission or
> concealment of the offense, increase by **2**
> levels.

USSG §3B1.3.  The only commentary relating to the abuse of a

position of trust enhancement appears in Application Note 1.  For

the period relevant here, the Application Note was quite terse.

It provided merely that:

> The position of trust must have contributed in some
> substantial way to facilitating the crime and not
> merely have provided an opportunity that could as
> easily have been afforded to other persons.  This
> adjustment, for example, would not apply to an
> embezzlement by an ordinary bank teller.

USSG §3B1.3, comment. (n.1) (1992).

On November 1, 1993, an amendment to the Application

Note became effective.  To the extent that the new Commentary

sheds any light on the nature of the relationships to which

§3B1.3 applies, we note that it refers exclusively to employment

or professional relationships, such as embezzlement by guardians,

bank executives, bank tellers, and attorneys, and sexual abuse of

patients by physicians.

The classic cases in this circuit in which we found

abuse of a position of trust fall within these categories.  See

United States v. Craddock, 993 F.2d 338 (3d Cir. 1993)

(enhancement for abuse of position of trust applicable to teller

of financial institution who processed Western Union money orders

knowing they were based on fraudulent credit card transactions);

United States v. Brann, 990 F.2d 98 (3d Cir. 1993) (enhancement applied to narcotics agent who embezzled government-provided funds by engaging in phony drug transactions and pocketing the money); United States v. Lieberman, 971 F.2d 989, 992-94 (3d Cir. 1992) (reversing failure to enhance for bank vice president); United States v. Georgiadis, 933 F.2d 1219, 1225 (3d Cir. 1991), (affirming district court's application of enhancement to assistant bank president who diverted funds to own account); United States v. McMillen, 917 F.2d 773, 775-76 (3d Cir. 1990) (branch manager operating a position of trust).

Nonetheless, we are unwilling to draw a bright line limiting the abuse of trust increase to the employment relationship. Neither the Guideline itself nor the Application Note that follows expressly limits its application to employment positions. In fact, other courts of appeals have found positions of trust outside the traditional employment context.[1] In United States v. Ledesma, 979 F.2d 816, 822 (11th Cir. 1992), the Court of Appeals affirmed the two level increase imposed on a defendant who had her young adult daughter bag cocaine and relay drug-related telephone messages. The court reasoned that an enhancement under §3B1.3 was appropriate because Ledesma, as

---

[1] In one case in this court, United States v. Astorri, 923 F.2d 1052, 1061 (3d Cir. 1991), although the district court did not address an enhancement based on abuse of a position of trust, and we did not require that it do so, one judge, in a dissent, suggested that §3B1.3 would apply to a broker who defrauded his fiancee's parents out of their life savings. The majority found enhancement on another basis.

7

mother, held a position of trust which she abused when she involved her daughter in the drug conspiracy.

In United States v. Zamarripa, 905 F.2d 337 (10th Cir. 1990), defendant, a friend of the family of an eight year-old girl whom he sexually abused while serving as her babysitter, was given a two-level enhancement. The Court of Appeals concluded that Zamarripa's position as babysitter was one of trust, which he had abused to facilitate his crime, and that therefore enhancement of his sentence in accordance with §3B1.3 was appropriate. See also United States v. Ellis, 935 F.2d 385, 395 n.9 (1st Cir.) (district court found abuse of a position of trust by defendant's sexual abuse of young daughter of his common law wife), cert. denied, 112 S. Ct. 201 (1991). We approvingly cited Zamarripa in Craddock, 993 F.2d at 343 n.7.

Accordingly, we are not prepared to hold that the abuse of a position of trust enhancement under §3B1.3 was not applicable to Pardo on the ground that he was not employed by the bank.[2] Instead we look to the essence of the meaning of a position of trust.

In determining the defining characteristics of a position of trust, we begin by considering the rationale for the

_____

[2]Pardo argues that the enhancement is not applicable to him because he does not fit into the language used in United States v. Hickman, 991 F.2d 1110, 1112 (3d Cir. 1993), where we stated that "[t]o abuse a position of trust, a defendant must, by definition, have taken criminal advantage of a trust relationship between himself and his victim." The government argues that the bank manager was the victim. Although we find this somewhat tenuous, we need not decide the application of Hickman in light of our disposition on other grounds.

8

two-level enhancement.  This court has noted that "[t]he rationale for increased punishment is that an <u>insider</u> who takes advantage of a position of trust to facilitate a crime is thought to be more culpable than one who simply commits the offense." <u>Craddock</u>, 993 F.2d at 340 (emphasis added).  This factor was subsequently clarified in the 1993 amendment to Application Note 1, which now provides in part:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (<u>i.e.</u>, substantial discretionary judgment that is ordinarily given considerable deference).  <u>Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.</u>

USSG §3B1.3, comment. (n.1) (emphasis added).[3]

More concretely, this court repeatedly has recognized that, "'the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which <u>the position provides the freedom to commit a difficult-to-detect wrong.</u>'"  <u>United States v. Lieberman</u>, 971 F.2d 989 (3d Cir. 1992) (emphasis added) (quoting <u>United States v Hill</u>, 915 F.2d 502, 506 (9th Cir. 1990)); <u>see also Craddock</u>, 993 F.2d at 341 (quoting this language); <u>Brann</u>, 990 F.2d at 103 (same).

Another factor that the case law identifies as relevant in finding a position of trust is the authority given to

---

[3]  <u>Craddock</u> distinguished the conduct of an insider from an abuse of "an opportunity that could as easily have been afforded to other persons."  <u>Craddock</u>, 993 F.2d at 340 (quoting USSG §3B1.3, comment. (n.1)).  Although the latter phrase was deleted from Application Note 1 of §3B1.3 in the 1993 amendment, other language added in that amendment underlined above makes it clear that the distinction made in <u>Craddock</u> is still applicable.

defendant by the position which provides the wherewithal to commit the wrongful act. See, e.g., United States v. Lamb, 6 F.3d 415, 421 (7th Cir. 1993) ("a position of trust is characterized by access or authority over valuable things") (quotations omitted). In McMillen, a branch manager of a savings and loan association approved fraudulent loans to himself, created a false savings certificate to serve as collateral for the loans, and opened a checking account in a fictitious name. See McMillen, 917 F.2d at 774. We held that because he had the authority to perform all of those acts without any supervision, he occupied a position of trust. See id. at 776. Later, in Lieberman, we emphasized the fact that the defendant bank manager was solely responsible for balancing the account from which he embezzled. See Lieberman, 971 F.2d at 993.

Similarly, in Brann where the defendant Narcotics Strike Force agent embezzled $18,000, we noted that the defendant's position enabled him to obtain $9,000 on two separate occasions, based solely on his assertion that he had set up drug buys. See Brann, 990 F.2d at 103. Although Brann did not hold a high level managerial post, we were swayed by the fact that his position entailed sufficient authority to allow him to embezzle in this respect. See id.

Finally, in Craddock, a teller participated in a conspiracy to defraud his employer by permitting his accomplices to provide false identification in connection with bogus credit card transactions via Western Union. Although Craddock was a low level employee, he had authority to verify the identity of the

10

persons to whom he was making payouts.  We held that the "key point . . . is . . . whether Craddock . . . exploited the authority provided by his position," Craddock, 993 F.2d at 343, and because he did we upheld the enhancement for abuse of a position of trust.  The characteristics of a position of trust defined in Craddock are as applicable outside of the employment context as well as in:

> the standard for tellers, as for clerks, mechanics, and all other defendants, is (1) whether the authority conferred and the absence of controls indicate that the employer relied on the integrity of the defendant to protect against the loss occasioned by the crime; and (2) whether the trust aspect of the job made the commission or concealment of the crime significantly easier.

Id. at 343.

Culling these principles from our cases, it follows that in considering whether a position constitutes a position of trust for purposes of §3B1.3, a court must consider: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.  These factors should be considered in light of the guiding rationale of the section--to punish "insiders" who abuse their positions rather than those who take advantage of an available opportunity.

By applying these factors to the facts of this case, it is evident that Pardo did not occupy a position of trust.  First, Pardo's "position" as a friend of the bank manager did not give

11

him the ability to commit a difficult-to-detect wrong. There would have been nothing difficult to detect had the routine precautions been taken. His friendship with the bank manager did not make her or the bank peculiarly vulnerable, as did the positions of mother, babysitter or stepfather in Ledesma, Zamarripa, and Ellis respectively. At most, Pardo's position as a friend allowed him the opportunity to commit an easily detectible wrong. Our cases and the Application Note counsel that this is simply not sufficient to warrant enhancement.

Even more clearly lacking in Pardo's case is the requisite degree of authority over the object of his wrong. Unlike the defendants in every other case considered in this circuit, or those involving non-employment situations cited by the government, Pardo had no authority over anyone or anything necessary to the commission of his crimes.

Thus, although Schumann may have relied on Pardo's integrity, he was not placed by the bank in any position that gave him the wherewithal to commit the fraud. He was in a far lesser position than the defendant in United States v. Kosth, 943 F.2d 798 (7th Cir. 1991), who submitted fraudulent credit card slips through the bank at which he obtained a merchant account. The Court of Appeals overturned the two point enhancement, stating that there was no special element of private trust involved, even though there was an element of reliance present. Id. at 800.

12

Because Pardo's position as Schumann's friend was not a position of trust within the meaning of §3B1.3,[4] we will remand to the district court for resentencing.

Next, we turn to Pardo's remaining claims of error. In his counselled brief, Pardo argues that he should have been granted a three level, rather than a two level, reduction for acceptance of responsibility. Because the district court is particularly well situated to evaluate the defendant's acceptance of responsibility, its determination in this regard may be reversed only if it is clearly erroneous. See United States v. Singh, 923 F.2d 1039, 1042-43 (3d Cir. 1991).

Section 3E1.1 of the Guidelines provides for a two level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." In addition, subsection (b) authorizes an additional one level reduction where the offense level is 16 or greater, and:

> the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:
>
> (1) timely providing complete information to the government concerning his own involvement in the offense; or
>
> (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently.

---

[4]In light of our decision on this issue, we need not consider whether there was sufficient evidence to support the second prong of §3B1.3, i.e., whether defendant's abuse of the position of trust "significantly facilitated the commission or concealment of the offense." USSG §3B1.3.

13

USSG §3E1.1(b).

The district court rejected Pardo's arguments that he was entitled to the three level reduction, finding that the information he provided regarding the fraudulent activities of Siam was incomplete.  Moreover, the district court, concluded that Pardo's plea was not timely, finding that his "plea came after a long period of flight, during which the government was put to a continuing investigation of defendant's many criminal schemes."  App. at 91.  These factual findings find ample support in the Presentence Report, and we cannot say they are clearly erroneous.  Thus, we will affirm this portion of Pardo's sentence.

Next, Pardo raises two additional claims in his supplemental pro se filing.  First, he contends that the district court's method of calculating his total offense level under the Sentencing Guidelines resulted in "double counting" of his failure to appear.  Because the appellant did not object to the enhancement in the Presentence Report, at the Sentencing Hearing or in any other manner in the district court, we review the district court's decision for plain error.  See Fed. R. Crim. P. 52(b); United States v. Olano, 113 S. Ct. 1770, 1778-79 (1993).

> Under the Sentencing Guidelines:
> [I]n the case of a conviction on both the underlying offense and the failure to appear, the failure to appear is treated under §3C1.1 (Obstructing or Impeding the Administration of Justice) as an obstruction of the underlying offense; and the failure to appear count and the count(s) for the underlying offenses are grouped together under §3D1.2(c).

14

USSG §2J1.6, comment. (n.3). Thus, the court arrives at a total punishment level, based on the underlying charge(s) and the obstruction charge. The district court followed the Guidelines precisely when it added two levels for obstruction of justice to the total offense level for the two fraud counts (Counts 2 and 16).

Because 18 U.S.C. § 3146(b)(2)(1988) requires that any sentence imposed for obstruction be imposed consecutive to any other sentence, the court must separate out the portion of the total sentence corresponding to obstruction. The Application Notes to §2J1.6 contemplate the very situation posed here:

> For example, where the combined applicable guideline range for both counts is 30-37 months and the court determines a "total punishment" of 36 months is appropriate, a sentence of thirty months for the underlying offense plus a consecutive six months sentence for the failure to appear count would satisfy these requirements.

USSG §2J1.6, comment. (n.3). Here, the court determined that the appropriate sentence for the defendant was 37 months, the maximum sentence in the range (31-37 months) based on its determination of his criminal history and base offense levels. The court then sentenced the defendant to 31 months on Counts 2 and 16, and six months on Count 47 (failure to appear). This sentence in no way involves double counting, and there was no error.

Pardo's final argument is that his criminal history level for Count 2 should have been I instead of II. However, Pardo's sentence for Count 2 was imposed concurrently with his sentence on Count 16. In this case, his sentence under Counts 16

15

and 47 would be identical even if his criminal history for Count 2 were I instead of II.[5] We decline to consider his challenge to his sentence under Count 2 under this circumstance.[6]

## III.

### CONCLUSION

For the foregoing reasons, we will vacate the judgment of sentence of the district court because of the two point increase for an abuse of position of trust under USSG §3B1.3, and will remand to the district court for resentencing consistent with this opinion. In all other respects, the judgment will be affirmed.

---

[5] Based on the total amount of loss caused by Pardo's wire fraud (in excess of $200,000), his more than minimal planning activity, his acceptance of responsibility and his obstruction of justice, his base offense level for the wire fraud would have been the same as it was for the bank and wire fraud together. Thus, based on the offense level for Count 16, and a criminal history of II for that count (which Pardo does not challenge), his sentence would not have been different even if count 2 were excluded. In any event, under the Guideline concept of grouping, the offenses would be treated together, rather than separately, as Pardo argues.

[6] In Ray v. United States, 481 U.S. 736, 737 (1987) (per curiam), the Supreme Court held that where a special assessment was imposed on three separate counts, they could not be considered concurrent sentences. Ray is inapplicable here because Pardo would still be subject to the separate special $50 assessment on each count. We have, when appropriate, applied the concurrent sentence doctrine after Ray. See United States v. American Investors of Pittsburgh, Inc., 879 F.2d 1087, 1100 (3d Cir. 1987) (opting not to consider claims of individual defendants whose sentences were concurrent and involved no detrimental effects).

16