**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4404
_____

UNITED STATES OF AMERICA

v.

CHARLES M. NASELSKY,
                              Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2-10-cr-00577-001)
District Judge: Honorable Paul S. Diamond

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
December 20, 2013

Before: JORDAN, VANASKIE, and GREENBERG, *Circuit Judges*

(Filed: March 21, 2014)
_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge.*

In 2012, defendant Charles Naselsky was convicted after trial of tax evasion, filing

a false tax return, wire fraud, and attempt to obstruct justice, as well as aiding and

abetting those last two offenses.  The United States District Court for the Eastern District

of Pennsylvania sentenced him to 70 months' imprisonment, a three-year term of

supervised release, restitution of $423,345, and a special assessment of $900. Naselsky now challenges his convictions for wire fraud and certain aspects of his sentence. For the reasons that follow, we will affirm the conviction and sentence.

I.

We write primarily for the parties to the action. Accordingly, we set forth only those facts necessary to our analysis.

In 2002, Naselsky, an experienced real-estate transactional lawyer, joined the Philadelphia-based law firm of Cozen O'Connor as a "senior member," a position considered by the firm's management to be "equivalent of what you would have today as a shareholder or as a partner or senior partner . . . in a partnership kind of law firm." (App. 70.) Naselsky was paid an annual base salary with the opportunity for cash bonuses. At the time of hiring, the firm provided Naselsky with a manual of employment policies, and he signed a form agreeing to read the manual. Included in that manual was a provision ("the 2001 Cozen policy") entitled "Professional Fees for Outside Activities," which, as of May 2001, stated as follows:

> [U]nless approval is secured from the Executive Committee in advance, all professional fees including legal fees of any kind, special counsel or solicitor fees, prosecutor salaries, executor fees, trustee fees, director fees, consulting fees and teaching salaries or stipends . . . which are generated directly or indirectly by lawyers employed by the firm shall be considered to be income to and the property of the firm.

(App. 663.)[1]

---

[1] At trial, the jury also saw a somewhat revised version of the Cozen policy which is said to date from November 20, 2010. The parties agree that the exact date of the

Among Naselsky's longstanding clients and social acquaintances were Ravinder and Hardeep Chawla, brothers who, through their companies, Sant Properties and World Acquisitions Partners, purchased and re-sold real estate in the Philadelphia market. In 2005, Naselsky contacted David Grasso, a real-estate developer, to see if he was interested in selling a valuable property located at 1500 Walnut Street in Philadelphia to the Chawlas. Grasso offered to sell the building for $35 million, which the Chawlas accepted. Naselsky represented Grasso throughout the transaction. The Chawlas, however, also regarded Naselsky as having "facilitate[d]" the transaction on their behalf, (App. 193), insofar as Naselsky was able to broker a crucial pre-closing extension from Grasso in return for a $600,000 investment by the Chawlas in Grasso's film production business, Tycoon Entertainment, a company in which Naselsky himself also had an equitable interest.

Shortly thereafter, Naselsky approached Grasso to see if he would also sell a second property to the Chawlas. Grasso agreed to sell the building, located at 1401 Arch Street, for $22.5 million. Naselsky again represented Grasso during negotiation of the

revisions, and therefore the verbatim text of the provision in Naselsky's particular manual, is unascertainable. The revised version of the Cozen policy reads as follows:

> Unless approval is secured from the CEO of the firm, or his/her designee, in advance, all professional fees of any kind including legal fees of any kind, special counsel or solicitor fees, prosecutor salaries, executor fees, trustee fees, director fees, consulting fees and teaching salaries or stipends . . . which are generated directly or indirectly by lawyers employed by the firm, shall be considered to be income to and the property of the firm.

(App. 663.)

3

sale agreement and at the closing. For each of these two transactions, Grasso received a bill for services from Cozen O'Connor and paid the law firm directly.

Thereafter, Naselsky met with Grasso and asked for $100,000 in cash to "take care of [him]" for going "above and beyond the call of duty." (App. 134.) Grasso initially responded that Naselsky had already been paid for his legal work. After considering the issue further, however, Grasso inquired whether Naselsky "had gotten this approved through his law firm," to which Naselsky "indicated that he had and . . . not to worry about it, that he had taken care of that." (App. 135.) Grasso ultimately agreed to pay Naselsky the additional funds, but requested an invoice for tax purposes. Naselsky sent him an invoice for $100,000 bearing the caption "Consulting services." (App. 139.) Grasso then wrote a check in that amount to Naselsky, dated January 19, 2006, which Naselsky deposited in his personal bank account.

Naselsky also received compensation from the Chawlas stemming from these transactions. In late 2005, the Chawlas wrote checks of $150,000 and $40,000 to Naselsky for his involvement in the sale of 1500 Walnut Street. Naselsky assured Hardeep Chawla that Cozen O'Connor "allows [him] to do that," meaning that it permitted him to receive such payments directly. (App. 186–87.) In July 2006, Naselsky left Cozen O'Connor and joined the law firm of Blank Rome. At that time the Chawlas, through Sant Properties, owed approximately $469,000 to Cozen O'Connor in unpaid

4

legal bills stemming from work for which Naselsky had been the billing attorney. (App. 79–80.)[2]

In early 2009, Naselsky learned that he was under investigation by federal authorities for failure to report on his tax returns the $190,000 he received from the Chawlas and the $100,000 he received from Grasso.[3] Through a series of email ruses, Naselsky unsuccessfully attempted to convince both the management at Blank Rome, where he remained employed, and the United States Attorney's Office that the $190,000 he had received from the Chawlas in 2005 was in fact a personal loan from a business acquaintance rather than unreported income.

On September 7, 2010, Naselsky was indicted by a federal grand jury for tax evasion, in violation of 26 U.S.C. § 7201 (Counts One and Two); filing a false tax return, in violation of 26 U.S.C. § 7206(l) (Counts Three and Four); wire fraud, and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Five, Six, and Seven); and attempting to obstruct justice, and aiding and abetting an attempt to obstruct justice, in violation of 18 U.S.C. §§ 1505 and 2 (Counts Eight and Nine).

At trial, the founder and chairperson of Cozen O'Connor, Stephen Cozen, testified that Naselsky had not sought prior approval from the firm regarding his personal

---

[2] The Government also offered evidence that between September 2006 and January 2007, after Naselsky had left Cozen O'Connor, he received six checks for $15,000 each from the Chawlas for his involvement in a 2005 purchase of property which did not involve Grasso. Because those payments are not central to any of Naselsky's claims on appeal, we will not address them.

[3] An agent for the Internal Revenue Service testified at trial that based on these unreported transactions and others, Naselsky had incurred an unpaid tax bill of roughly $115,000.

5

acceptance of funds from Grasso or the Chawlas, nor did he disclose those sums to the firm after receiving them. Cozen stated that he and the firm "[a]bsolutely" would have considered the payments received by Naselsky to be property of the firm. (App. 84.) He further opined that any senior member of the firm, or in fact any "average intelligent human being" would have understood that "finder's fees" and "commissions" were among the types of payments covered by the 2001 Cozen Policy. (App. 90–91.)

At the conclusion of the presentation of the evidence, Naselsky moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on Counts Five, Six, and Seven of the indictment on the theory that the evidence was insufficient to support a finding of intent to commit wire fraud. The District Court denied the motion. On September 24, 2012, a jury found Naselsky guilty on all counts.

At sentencing on November 20, 2012, the parties agreed that Naselsky's base offense level was 21 and his criminal history category was I. Over Naselsky's objections, the District Court imposed a two-level enhancement for use of a special skill under U.S.S.G. § 3B1.3, and a two-level enhancement for abuse of trust under the same section, resulting in a Guideline range of 57 to 71 months. The Court then sentenced Naselsky to 70 months of incarceration, near the top of the Guideline range. Naselsky filed a timely notice of appeal on November 30, 2012.

II.

The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

6

We exercise plenary review over a defendant's sufficiency-of-the-evidence claims. *See United States v. Miller*, 527 F.3d 54, 60 (3d Cir. 1999). We also give plenary review to legal questions regarding the applicability of the Sentencing Guidelines, including with respect to whether a defendant occupied a position of trust. *See United States v. DeMuro*, 677 F.3d 550, 567 (3d Cir. 2012) (citing *United States v. Hart*, 273 F.3d 363, 376 (3d Cir. 2001)). Factual findings, such as whether the defendant abused that position of trust to commit the offense, are reviewed for clear error. *Id.*

III.

Naselsky argues that the Government failed to establish specific intent to defraud with respect to Counts Five, Six, and Seven of the indictment, which charged wire fraud. A defendant challenging the sufficiency of the evidence on appeal "bears a heavy burden." *United States v. Casper,* 956 F.2d 416, 421 (3d Cir. 1992). Sitting en banc, we have recently described that standard as follows:

> We "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[ ] beyond a reasonable doubt." [*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)]. Under this particularly deferential standard, we "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Id.* Furthermore, "we review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." [*United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010)]. We must sustain the jury's verdict "if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003).

7

*United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). We

also recognized the Supreme Court's admonition that "the verdict must be upheld as long

as it does not 'fall below the threshold of bare rationality.'" *Id.* (quoting *Coleman v.*

*Johnson*, --- U.S. ---, 132 S.Ct. 2060, 2065 (2012)).

To prove wire fraud, the Government must establish the following three elements:

"(1) the defendant's knowing and willful participation in a scheme or artifice to defraud,

(2) with the specific intent to defraud, and (3) the use of . . . interstate wire

communications in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245,

261 (3d Cir. 2001), *abrogated on other grounds by Skilling v. United States*, 561 U.S.

358 (2010). The Government may prove intent to defraud by way of circumstantial

evidence. *See United States v. Riley*, 621 F.3d 312, 333 (3d Cir. 2010). The scheme at

issue may involve an "affirmative misrepresentation," but can also be predicated upon

"omissions reasonably calculated to deceive persons of ordinary prudence and

comprehension." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir.

1991) (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978)).

The only element at issue here is whether the Government proved that Naselsky

had a specific intent to defraud Cozen O'Connor.[4] Naselsky submits that he could not

---

[4] The District Court's instruction on that element, which is not challenged by Naselsky, is as follows:

> The second element that the government must prove beyond a reasonable doubt is that Charles Naselsky acted with specific intent to defraud. To act with specific intent to defraud means to act knowingly and with the intention or the purpose to deceive or to cheat.

have committed fraud by withholding the funds at issue because the 2001 Cozen policy "was at best ambiguous" regarding the types of income accruing to the firm rather than the employee. Appellant's Br. at 25. Stated differently, Naselsky urges that "no rational fact finder could have found that [he] intended to violate a policy that did not apply to him on its face." *Id.* at 17. This position depends on Naselsky's characterization of the sums he received from Grasso and the Chawlas as "finder's fees" which were purely "a reward" for his limited role in introducing those parties to one another. *Id.* at 16. He suggests that because this act of introduction "was completed in a virtual instant," Appellant's Reply Br. at 11, he did not draw upon the time or resources of Cozen O'Connor such that the firm would be entitled to the proceeds.

Assuming that Naselsky's position is a plausible view of the facts presented at trial, it does not follow that the evidence was insufficient to support the view apparently adopted by the jury, *i.e.*, that the funds were due to Cozen O'Connor under the 2001 Cozen policy because they stemmed from deal-making inseparable from Naselsky's operations as a practiced real-estate attorney. Stated otherwise, the jury finding of intent to defraud Cozen O'Connor does not "fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. On this record, the jury was capable of finding that Naselsky, using precisely the same relationships and legal expertise for which he was paid by Cozen O'Connor, brokered two substantial real-estate transactions and then obtained additional compensation for his professional work in those very matters. Even

(App. 431.)

9

without relying on the interpretation of the 2001 Cozen policy supplied by the firm's chairperson, we conclude that a rational trier of fact could find that the payments obtained by Naselsky from Grasso and the Chawlas constituted "professional fees" due to Cozen O'Connor, (App. 666), and that Naselsky possessed a specific intent to defraud the firm with respect to those fees.

Naselsky also claims that a scheme to defraud cannot be predicated upon mere omissions where the duty to disclose stems solely from a contract. *See* Appellant's Reply Br. at 5–7 (citing *United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012); *United States v. Colton*, 231 F.3d 890, 899–901 (4th Cir. 2000)). In other words, because he was under no fiduciary or other legal obligation in addition to his contractual duty to report the payments at issue to his law firm, Naselsky suggests he cannot be held liable in fraud for passively failing to comply with a contractual condition of employment. At most, he contends, this would amount to a breach of contract.

The cases cited by Naselsky clarify, however, that conduct involving affirmative concealment, such as "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter" is, like an affirmative misrepresentation, sufficient to establish fraud. *Steffen*, 687 F.3d at 1115 (quoting *Colton*, 231 F.3d at 899). Here, viewing the evidence in the light most favorable to the Government, the record shows that Naselsky assured both Grasso and the Chawlas that Cozen O'Connor permitted him to accept the payments at issue. These representations not only induced the remittances, but also reduced the likelihood that Grasso and the Chawlas might attempt to confirm the propriety of Naselsky's request

10

with other lawyers at Cozen O'Connor.  Later, Naselsky crafted a string of misleading emails to create the perception that the payments from the Chawlas were personal loans rather than income that might be due, in part or in whole, to Cozen O'Connor or Blank Rome.  Because these actions had the effect of minimizing the defrauded party's likelihood of discovering the wrong, we conclude that the Government's proof was sufficient to sustain the verdict.  Accordingly, we will affirm the District Court's judgment of conviction on the wire fraud counts.

IV.

Naselsky also challenges the District Court's application of sentencing enhancements to his wire fraud convictions for use of a special skill and abuse of trust. Both enhancements arise under § 3B1.3 of the Sentencing Guidelines, which directs a two-level increase where "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]"  U.S.S.G. § 3B1.3.

A position of "public or private trust" is "characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference)."  *Id*. at cmt. n.1.  We apply a three-part test to determine whether someone occupies a position of trust: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been a reliance on the integrity of the person occupying the position." *United States*

11

*v. Hart*, 273 F.3d 364, 376 (3d Cir. 2001) (quoting *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994)).

Here, the theory of the Government's case was that Naselsky abused his trusted position as a senior member of Cozen O'Connor to deprive the firm of professional fees derived from his practice of law. The Government adduced evidence that Naselsky alone was in an authoritative position to seek the additional payments at issue from his clients and business partners, and to convince them that he had permission from the firm to do so. Further, Naselsky concedes that the firm did not monitor his tax filings, which in any event would not have disclosed the challenged payments, and instead relied on his integrity to self-report payments possibly implicating the 2001 Cozen policy. On these facts, we conclude that (1) Naselsky was in a position of trust for purposes of the sentencing enhancement, and (2) the District Court's factual finding that Naselsky abused his position of trust to commit the offense of wire fraud against his employer was not error. The two-level enhancement for abuse of trust was thus properly applied.

Next, we consider the District Court's application of an enhancement for use of a special skill. "Special skill" is defined as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.1, cmt. n.4; *United States v. Maurello*, 76 F.3d 1304, 1314 (3d Cir. 1996). Naselsky does not dispute that as an attorney he possessed special professional skills. Instead, in accord with his argument that the fees at issue would have been paid to any person who brought Grasso and the Chawlas together for business, he contends that his actions here amounted to little more than introducing two acquaintances and

12

depositing checks into his personal bank account, neither of which requires special skill. As explained by the District Court, however, the Government introduced evidence that Naselsky "used his skill to set up [the transactions between Grasso and the Chawlas] so that he was in a position to ask for these commission finder's fees, and that did require special skill." (App. 456.) Indeed, the record reveals that the wrongdoing at issue was enabled predominantly, if not exclusively, by Naselsky's application of his abilities as an experienced real-estate lawyer. Accordingly, we conclude that the District Court did not commit plain error in applying the "special skill" enhancement on these facts.

V.

In sum, we reject Naselsky's challenge to the sufficiency of the evidence as to his convictions on Counts Five, Six, and Seven of the indictment, and conclude that the District Court committed no error in applying sentencing enhancements for abuse of trust and use of a special skill. We will affirm the conviction and sentence.