HARDIMAN, Circuit Judge, dissenting.
Because I agree with neither the Majority's conclusion nor the path it took to get there, I must respectfully dissent. I write separately to reiterate my view that we should interpret the United States Sentencing Guidelines (USSG) according to their plain language without adding extra-textual "tests."
Based in part on a two-level enhancement for abuse of a position of trust under § 3B1.3 of the Guidelines, the District Court treated Douglas's offense level as 43 because its initial calculation (44) was so high that it was literally "off the charts." Douglas's crime was so severe that, despite the fact that this was his first offense, the Guidelines suggested a sentence of life imprisonment. Had the District Court disagreed with the Probation Office's recommendation that § 3B1.3 applied to Douglas, his offense level would *137 have been 42, yielding a Guidelines range of 360 months to life.
As the Majority acknowledges, the District Court sentenced Douglas to 240 months in prison, which was a considerable downward variance. Is there any reason to believe that Douglas's sentence would have been different had the District Court denied the enhancement and fixed Douglas's Guidelines range at 360 months to life? I think not. After the initial sentencing proceeding, review by a panel of this Court, consideration of the appeal by the Court sitting en banc, and a second round of sentencing by the District Court, I expect the matter to end up right where it started: with a 240-month sentence. See, e.g. , United States v. Zabielski , 711 F.3d 381, 388-89 (3d Cir. 2013) (erroneous application of enhancement was harmless where "there [wa]s a high probability that it would have imposed the same sentence irrespective of the ... enhancement").
Although I am not convinced that the transcript of Douglas's sentencing hearing reflects the same sort of "detailed findings of fact and explanation" that justified our application of the harmless-error doctrine in Zabielski , see id. , it's hard to imagine why the District Court would, after giving Douglas such a substantial downward variance, conclude on remand that an even greater variance is appropriate simply because Douglas did not exercise professional or managerial discretion. Regardless of whether Douglas was a "fiduciary," a "professional," or a "manager," the fact remains that he had a security clearance that gave him special access to sensitive locations at an international airport, which he abused in order to facilitate large-scale drug trafficking to the great detriment of the public. In my view, this satisfies § 3B1.3.
Although I agree with the result she reaches, I cannot join Judge Shwartz's thoughtful dissent because I do not agree that the factors we established in United States v. Pardo , 25 F.3d 1187 (3d Cir. 1994), are worth retaining. Hearing this case en banc gave us an opportunity to scuttle this test, which strays far from the text of § 3B1.3. Compare USSG § 3B1.3 (enhancement applies "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense"), with Pardo , 25 F.3d at 1192 ("[c]ulling ... from our cases" the following factors: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position," to be "considered in light of the guiding rationale of the section-to punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity").
In seeking to refine the Pardo test, the Majority adds even more extra-textual requirements to what was already an unnecessarily prolix framework. This new iteration divides the § 3B1.3 inquiry into a "preliminary, status-focused question of whether a defendant held a position of public or private trust," which then "ask[s] whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted." Id. at 132-33. If this new set of prerequisites is satisfied, it is then capped off by a Pardo analysis, which requires an examination of how the crime was committed. I recommend we eschew this schema in favor of one relevant question: did the District Court err in concluding that Douglas *138 abused a position of public trust? See USSG § 3B1.3.
I agree with the Majority that the Guidelines commentary is entitled to "controlling weight." Stinson v. United States , 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (quoting Bowles v. Seminole Rock & Sand Co. , 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) ). But Judge Shwartz is correct that the relevant application note, which explains that a position of trust is "characterized by professional or managerial discretion (i.e. , substantial discretionary judgment that is ordinarily given considerable deference)," does not foreclose the application of the § 3B1.3 enhancement to Douglas even though he did not exercise the discretion of a "manager" or "professional." Shwartz Dissent at 138 (quoting USSG § 3B1.3 cmt. n.1). The phrase "characterized by," along with the use of "i.e. ," confirms that such discretion is merely "typical or characteristic of" a position of trust rather than a necessary component. See Characterize 2 , Oxford English Dictionary (2017); see, e.g. , United States v. Thomas , 315 F.3d 190, 204 (3d Cir. 2002) (applying § 3B1.3 enhancement to a non-manager), abrogated on other grounds by Loughrin v. United States , --- U.S. ----, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014). In light of his ability to bypass airport security and go "almost everywhere" in and around sensitive areas of the terminal during his overnight shift, App. 140-42, Douglas was hardly an "ordinary bank teller or hotel clerk." USSG § 3B1.3 cmt. n.1.
In sum, I would discard the Pardo test and review the District Court's analysis by applying the text of § 3B1.3, as informed by its application notes, without further embellishments. Accordingly, I would affirm the District Court's judgment sentencing Douglas to 240 months' imprisonment, not only because its application of the § 3B1.3 enhancement was legally sound, but also because the absence of that enhancement-which would have yielded an advisory Guidelines range of 360 months to life-should not affect what was already a very substantial downward variance.
Despite the additional discretion the Supreme Court granted to district judges in United States v. Booker , 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), our sentencing review has become increasingly formalistic: the district court applies an enhancement, the defendant appeals on procedural reasonableness grounds, and this Court spills much ink exploring the finer points of the enhancement instead of evaluating the more meaningful sentencing factors stated in 18 U.S.C. § 3553(a). I fear that we are losing the forest for the trees-and this case is a prime example of the problem. With respect, I dissent.
SHWARTZ, Circuit Judge, dissenting with whom CHAGARES and VANASKIE, Circuit Judges, join.
Our colleagues have concluded that our long-standing test for applying the enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3 set forth in United States v. Pardo, 25 F.3d 1187 (3d Cir. 1994), should be changed and that, in considering whether to apply the enhancement, courts should not take into account the context in which the defendant's actions took place. We disagree. As explained below, the text of the Guideline and its application notes support considering the context of the defendant's actions in determining whether he occupied a position of trust and abused it. The Pardo test, which tracked the Guideline, appropriately allowed sentencing courts to consider context and should not be disturbed.
*139 I
Section 3B1.3 calls for a two-level enhancement of a defendant's sentence "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." The application note to § 3B1.3 states that positions of trust are "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference) ... [and are occupied by persons who] ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."[1] § 3B1.3 cmt. n.1. The use of the word "characterized" in describing "managerial or professional discretion" demonstrates that the enhancement is not limited to defendants who hold a professional or managerial job title. See, e.g., United States v. Thomas, 315 F.3d 190, 204 (3d Cir. 2002) (home health aide, who opened the victim's mail and paid bills for her, held a position of trust because "[t]hese tasks clearly invested [the aide] with considerable discretion since [the victim] did not monitor [her] closely and appeared to rely on her judgment and integrity"), abrogated on other grounds by Loughrin v. United States, --- U.S. ----, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014). Moreover, by using the signal "i.e." (which means "that is," Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/i.e.), the Commission is directing courts to focus on whether the discretion the person has is ordinarily given significant deference and whether the person is ordinarily subject to less supervision. Furthermore, while a defendant who is a fiduciary or who holds fiduciary-like status may qualify for the enhancement, fiduciary status is not required. In fact, in describing when the adjustment applies, the Commission identified, "for example," the following situations: an attorney serving as a guardian who embezzles client funds, a bank executive who perpetrates a fraudulent loan scheme, and a doctor who sexually abuses a patient "under the guise of an examination." U.S.S.G. § 3B1.3 cmt. n.1. By using the words "for example," the Commission informs us that there could be positions to which the enhancement applies where the holder of the position has discretion but is not a fiduciary.[2]
*140 Notably absent from the Guidelines and the commentary is guidance concerning the meaning of the phrase "position of public trust." The word "public" has several meanings, including "of or relating to people in general," Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/public, and the word "trust" in this context refers to "one in which confidence is placed," id., available at https://www.merriam-webster.com/dictionary/trust. Applying the dictionary definitions, "position of public trust" under § 3B1.3 means a position in which people in general have placed confidence. The public expects those holding such positions to act in the public's interest.[3]
Case law also recognizes that it is proper to consider the public's expectations of a particular position when evaluating whether the enhancement applies. For example, the public expects a health care provider who submits a claim to Medicare to provide truthful claims for reimbursement from government funds, see, e.g., United States v. Babaria, 775 F.3d 593, 596-97 (3d Cir. 2014), a pharmacy intern to appropriately handle medications, United States v. Agyekum, 846 F.3d 744, 753-54 (4th Cir. 2017), a deputy marshal not to misuse his ability to avoid searches so he can transfer a firearm to a felon, a police officer not to use drug-buy money for his own gain, United States v. Brann, 990 F.2d 98, 103 (3d Cir. 1993), and water district employees not to submit false documents regarding water quality, United States v. Kuhn, 345 F.3d 431, 436-37 (6th Cir. 2003) ; United States v. White, 270 F.3d 356, 371-73 (6th Cir. 2001). In each instance, the public's expectations of how these individuals should act stem from a code of conduct, ordinances, oaths, regulations, and statutes that govern their conduct given the jobs they hold or the places where they work and inform whether they hold positions of public trust.
The same applies to an individual who works at an airport. Airport security in the United States is run by the Transportation Security Administration (the "TSA"), a government entity created in the aftermath of the September 11 terrorist attacks to secure our airports and air travel. Vanderklok v. United States, 868 F.3d 189, 206 (3d Cir. 2017). The TSA addresses security in many ways, including by ensuring that anyone who works at an airport undergoes *141 criminal and intelligence background checks and receives training in airport security.[4] Only those individuals who receive security clearance and complete the security training are given access to secured areas of the airport.[5] In addition, the TSA checks the identification of and searches all passengers. Areas that were formerly accessible to nontravelers, such as boarding areas, are now off-limits to all but those who have been through security or have security clearance.
Airport security is considered a critical component of national security, and government authorities that grant access to secured areas expect those with access to act with integrity. Furthermore, the public trusts that airport employees will act in accordance with those systems and not use their positions to circumvent security measures to smuggle weapons or other contraband. Indeed, the public cedes its judgment to those who are permitted in secured areas and is vulnerable to those who misuse their security clearance. In this way, airports are unique given the Government's implementation of robust and comprehensive security systems and the public's expectation that those who work at airports will keep them safe. Thus, an airport employee granted a security clearance is reasonably viewed as one who occupies a position of public trust that can be breached by using his or her position to further a crime. See United States v. Higa, 55 F.3d 448, 453 (9th Cir. 1995) (leaving undisturbed the § 3B1.3 enhancement imposed on an airline customer service representative who "used his position with the airline to gain entry into areas where others could not" to smuggle drugs (internal quotation marks omitted) ).
Due to the critical importance of airport security and the public's trust in those who have clearances, and considering the expansive nature of Douglas's access to secured areas at an international airport, including the planes themselves, we cannot say that the District Court abused its discretion in concluding that Douglas held a position of public trust. While the record does not indicate how closely Douglas was supervised while performing his mechanic duties, it is evident that he was vested with significant discretion. Douglas's receipt of an Airport Operation Authority ("AOA") badge shows that the TSA and airport *142 vested him with discretion to access areas of the airport in ways members of the public and other employees could not. More specifically, Douglas had unfettered and unescorted access to planes, which the Government goes to great lengths to protect by screening every passenger who seeks to board and inspecting each bag placed within. Like the pharmacist with access to controlled substances and the health provider who submits claims for payment from the United States Treasury, Douglas, as an airport employee with security clearance, was governed by a regulatory scheme imposed to protect the public. The public, in turn, relies on people like Douglas not to misuse their special status. In short, the context in which Douglas engaged in his criminal activity and the public's expectations for how someone in his position should behave show that he occupied a position of trust.
Thus, Douglas held a position of trust because (a) national security and public safety concerns in the context in which he worked are paramount, (b) the Government has implemented significant security systems to address those concerns, (c) the public relies upon those security measures and trusts those with security clearances and the authority they have been granted to act in a responsible fashion, and (d) Douglas was vested with authority to access secure locations at the airport.[6]
Concluding that an airport worker like Douglas holds a position of public trust finds support in cases that have held that prison workers hold positions of trust. Both airports and prisons have governmentally-imposed security measures designed to keep the location secure and to protect the public. Prison employees are given authority to enter these secured places, and misuse of this access can pose a risk to public safety. For these reasons, our sister circuits have applied the § 3B1.3 enhancement to prison workers who abuse positions that gave them special access to highly secure and regulated locations. See United States v. Gilliam, 315 F.3d 614, 618 (6th Cir. 2003) (drug counselor used his position to engage in drug dealing with prisoners); United States v. Brown, 7 F.3d 1155, 1162 (5th Cir. 1993) (prison food service manager who smuggled prisoners the proceeds of a Postal Service money order scheme); United States v. Armstrong, 992 F.2d 171, 172-73 (8th Cir. 1993) (prison instructor who solicited inmates to manufacture and pass counterfeit bills). This is because "the public places tremendous trust in prison employees that they will not conspire with inmates to violate the law." Gilliam, 315 F.3d at 618 (alteration, citation, and internal quotation marks omitted). Similarly, the layers of security at airports "advance[ ] the public interest" in national security, United States v. Hartwell, 436 F.3d 174, 179 (3d Cir. 2006) ; see also *143 Singleton v. C.I.R., 606 F.2d 50, 52 (3d Cir. 1979) (recognizing the government's "compelling reasons" for airport and airline security),[7] and those who misuse their secured access undermine that interest and violate the public trust.
For these reasons, the context in which Douglas committed his crime shows that he did so by abusing a position of public trust and he is subject to the enhancement.
II
Aside from forbidding sentencing judges from considering context, the Majority chose to modify our decades-old test, known as the Pardo test or Pardo factors, for applying the enhancement. No party requested a rejection or even modification of Pardo , the Pardo test has not resulted in either an overuse or misuse of the enhancement, and most importantly, the test comports with the Sentencing Guidelines. Thus, no modification of Pardo is required.
Pursuant to Pardo ,
the inquiry into whether a defendant was appropriately subject to a § 3B1.3 enhancement is twofold. First, the court must determine whether a defendant was placed in a position of trust, and, if he was, it must then determine whether he abused that position in a way that significantly facilitated his crime.
In determining whether a position of trust exists, we consider three factors: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority to which the position vests in defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.
Babaria, 775 F.3d at 596 (citations and internal quotation marks omitted). The Majority says that the Pardo test does not address whether a defendant holds a position of trust and does not track the components of § 3B1.3-discretion, deference, and supervision. We disagree. Pardo 's consideration of authority and the freedom to commit a difficult-to-detect wrong speaks to discretion and the presence or absence of supervision. Pardo 's consideration of whether a person's integrity is relied on speaks to whether his judgment is worthy of deference.
Moreover, the Pardo test ensures that sentencing courts apply the enhancement by considering the context within which the defendant acted and the expectations *144 of those who reposed trust in him. Under the Pardo test, neither titles nor job descriptions dictate whether the person held a position of trust. Rather, Pardo provides factors for applying the enhancement, mindful that the purpose of the enhancement is to "punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity." Pardo, 25 F.3d at 1192 ; see also United States v. DeMuro, 677 F.3d 550, 567-68 (3d Cir. 2012). By barring consideration of context (which the Pardo factors appropriately considered), the Majority has narrowed the circumstances when the text of the Guidelines and application notes would plainly support applying the enhancement. Particularly in the context of public trust, whether that person abuses his position of public trust requires consideration of context-specific matters such as the nature of the relationship between the defendant and the public and the public's expectations for someone who holds a position like the defendant, regardless of his job title or actual duties.
Considering the context and the relationship between Douglas's authority and the public's expectations, which include the fact that Douglas worked at an international airport subject to TSA regulations that gave him unfettered access to secured areas, his position provided him the means to "commit a difficult-to-detect wrong" because it permitted him to bypass security measures, which dramatically reduced the likelihood that luggage containing the drugs he was smuggling would be searched.[8] See Pardo, 25 F.3d at 1192 (emphasis omitted). He was vested with discretion in exactly the area that related to "the object of the wrongful act"-he was able to move freely into the terminal without inspection. Id. Finally, it is reasonable to infer that airport leadership and government authorities granted him a security clearance in "reliance on [his] integrity," trusting that he would not abuse it to circumvent airport security. Id. Thus, Douglas held a position of public trust as contemplated under § 3B1.3, which he abused.
III
Because the Pardo test comports with the Sentencing Guidelines, and because the Majority's test is unduly restrictive in its prohibition against considering the context within which the defendant exercises discretion, and fails to recognize the unique nature of what constitutes a position of public trust and how it can be abused, we respectfully dissent.[9]

The full note provides:
"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.
U.S.S.G. § 3B1.3 cmt. n.1.

Other language in the Guideline and its application notes show that § 3B1.3 is not limited to defendants who are fiduciaries or hold fiduciary-like positions or who hold positions of authority. For instance, Application Note 2, entitled "Application of Adjustment in Certain Circumstances," mentions persons who hold positions that could impact the public at large, namely postal employees who steal or destroy United States mail and individuals who have access to personal identifying information, such as state motor vehicle department employees who are authorized to issue driver's licenses. Neither is a fiduciary and neither holds a position of authority. Rather, each is an individual who has access to something the public entrusted to them. While this note directs that the enhancement must apply in these situations, it is clear from later application notes that this note is not a limitation. For example, in Application Note 5, the Commission identified "additional illustrations" in which the enhancement applies, such as the union context. This reflects that the application notes provide examples that are not exhaustive.

Section 3B1.3 's Application Note 2 provides two examples that fit this definition. Each person described in the note is one in whom the public has placed confidence based upon their access to something valuable, such as an individual's mail, personal identifying information, or a government-issued identification. In addition, these individuals have discretion concerning how they perform their duties within the confines of some regulation, statute, or code of conduct. Such rules and guidelines seek to ensure that these individuals do not misuse the authority they have been given and meet what the public expects of them. For the letter carrier, the public expects that the mail entrusted to him or her will be kept safe and delivered to the intended destination. For the DMV employee, the public expects that the employee will neither misuse the personal information to which he has access nor issue a valuable government identification to someone not entitled to it.

See 49 C.F.R. § 1540.205(b), (d) (explaining that the TSA performs an "intelligence-related check" and, if an applicant "meets the security threat assessment standards," then the "TSA serves a Determination of No Security Threat on the applicant"); id. § 1542.213(c) (stating that an "airport operator may not authorize any individual unescorted access to the [Airport Operation Authority] AOA ... unless that individual has been provided" various forms of training, including in "[s]ecurity responsibilities"); id. § 1544.228(a), (b) (providing that any individual who, among other things, has unescorted access to cargo or performs certain functions related to the transportation of cargo "must successfully complete a security threat assessment").

See 49 C.F.R. § 1540.5 (stating that "Secured Area means a portion of an airport ... in which certain security measures specified in part 1542 of this chapter are carried out" and that "Security Identification Display Area (SIDA) means a portion of an airport ... in which security measures specified in this part are carried out"); id. § 1540.105(a) (describing the "security responsibilities" of individuals with AOA access badges including the prohibition from the use of AOA access "in any other manner than that for which [the badge] was issued"); id. § 1542.203(b) (stating that "[e]ach airport operator required to establish an AOA must prevent and detect the unauthorized entry, presence, and movement of individuals and ground vehicles into or within the AOA by," among other things, "[p]rovid[ing] security information ... to each individual with unescorted access to the AOA"); id. § 1542.205(a)(2) (providing that each area that is regularly used to load and unload cargo must be a SIDA).

While issues of national security and public safety provide a basis for an upward departure under U.S.S.G. § 5K2.14, that departure provision covers a concern that differs from that addressed by § 3B1.3. Section 5K2.14 permits an upward departure "[i]f national security, public health, or safety was significantly endangered" as a result of the defendant's conduct, regardless of where the conduct took place. Thus, § 5K2.14 focuses on the consequences of the defendant's actions. Section 3B1.3 focuses on the position the defendant held and whether he abused it. Cf. United States v. Kikumura, 918 F.2d 1084, 1118 (3d Cir. 1990) (acknowledging that the upward departures for conduct that endangers the public safety under § 5K2.14 and extreme conduct under § 5K2.8 may overlap but concluding that they address "analytically distinct" concepts, where the national security enhancement addresses the impact of the defendant's dangerous conduct on "safety and welfare of the general public"), overruled on other grounds, United States v. Grier, 449 F.3d 558, 570 (3d Cir. 2006).

That Douglas's job did not task him with preventing the type of wrong that he committed does not undermine the conclusion that he was able to commit the crime as a result of the position of trust he held. Like the prison employees who were not specifically tasked with preventing contraband from moving through the prisons, Douglas used his unfettered and unescorted access at the airport to surreptitiously move contraband and abuse his position of trust. See Gilliam, 315 F.3d at 618 ; Brown, 7 F.3d at 1162 ; Armstrong, 992 F.2d at 172-74.
Furthermore, although Douglas was a mechanic, this does not mean that he did not hold a position of public trust. It is undeniable that he held a position of trust insofar as he was given access to aircraft engines and the public would trust him not to use his position to tamper with the engines. To limit the enhancement to situations only where the crime is at the heartland of his job duties as a mechanic, however, would enable him to avoid the enhancement where, for example, he entered a secured area and committed a different crime, such as slashing the plane's tires. In short, the applicability of the enhancement should be context-specific, rather job-specific.
Moreover, the fact he may not hold a position of authority does not mean that he does not hold a position of trust. A night watchman at a nuclear facility, who supervises no one, surely holds a position of trust because he is vested with tremendous responsibility to keep the facility secure to protect the public.

That Douglas could have been subjected to random searches does not alter this conclusion, because Douglas was still trusted to move past security at will without inspection the vast majority of the time, and hence, he was largely deferred to.

This case may provide an occasion for the Sentencing Commission to review § 3B1.3. Much has changed since § 3B1.3 was first enacted and even since it was last amended. For instance, when Application Note 1 excluded a bank teller from being subjected to the enhancement, a teller did not have computer access to a customer's entire banking record. Now, like the DMV employee referenced in Application Note 2, a teller has access to and is entrusted with personal identifying and bank information. Similarly, in this era where cyber and national security concerns are paramount, the Commission may wish to consider whether the enhancement should apply to those who hold positions that provide the means to compromise cyber or national security even where their core job duties may not require them to interface with cyber or national security matters. Finally, the Commission may wish to define the phrase "position of public trust" and provide guidance as to whether the context in which a defendant carried out a crime can be considered in determining whether he holds a position of trust.